## HOLDEN *v.* JOY.

1. The treaty of the 29th December, 1835, between the United States and the Cherokee Indians, was not made in virtue of the act of 28th of May, 1830, authorizing an "exchange" of lands west of the Mississippi, for the territory claimed or occupied by any tribe of Indians within the limits of any State or Territory, but was made under the treaty-making power vested by the Constitution in the President and Senate.
2. The Indian tribes are capable of taking as owners in fee simple lands by purchase where the United States in form, and for a valuable and adequate consideration, so sell them to them.
3. Such sale is properly made by a treaty.
4. The above-mentioned treaty of 29th December, 1835, made such a sale to the Cherokee Indians of the lands west of the Mississippi, known as the "Cherokee Neutral Lands," and the fact and validity of the sale have been recognized by Congress through appropriations made in execution of the treaty making it.
5. The cession to the United States by the Cherokees, in the treaty of June 19th, 1866, of the said Neutral Lands owned by them as aforesaid, in trust that the United States should sell them and hold the proceeds for the benefit of the said Indians, was a lawful cession and trust, and in accordance with the policy and practice of the government.
6. It did not amount to an "abandonment" of the lands; and therefore cannot raise a question whether the lands reverted to the United States in pursuance of a condition inserted in the patent, that the lands should revert to the government, if the Cherokees abandoned them; assuming that such a condition was lawful and of any effect, a matter not conceded.
7. Assuming that either this provision in the patent or the extent to which the Cherokees joined the rebel confederacy in the late rebellion amounted to any abandonment, the United States, the grantors, alone could take advantage of the breach of condition.
8. Their acceptance of the lands in trust, to sell them for the benefit of the Cherokees, condoned the breach of condition if there was one.
9. The supplemental article of April 27th, 1868, to the already-mentioned treaty of June 19th, 1866, was valid; and the sale and patent made to one Joy pursuant to its purpose passed a good title to the said Joy; though the treaty did not convey, *proprio vigore*, the lands meant to be sold, though it required officers of the United States to do certain acts before the sale could be consummated, and though the contract of sale to Joy was signed before the treaty was promulgated.

APPEAL from the Circuit Court for the District of Kansas; the case being thus:

Prior to the year 1817 the Cherokee Indians all resided

on the east of the Mississippi; largely in Georgia. By treaties of the year named, and of 1819,* the tribe was divided into two bodies, one of which remained where they were, east of the Mississippi, and the other settled themselves upon United States land in the country on the Arkansas and White Rivers. The government being desirous to get the entire tribe to the west of the Mississippi River, treaties were made by the United States, May 6th, 1828, and February 14th, 1833,† with this western part of the tribe, by which the United States agreed to "possess" them as well as those of their brethren who still resided in States east of the Mississippi, and to guarantee to them all forever 7,000,000 acres of land west of the Arkansas. But the part of the tribe east of the river did not largely emigrate.

On the 28th of May, 1830, Congress passed an act‡ entitled "An act to provide for an *exchange* of lands with the Indians, residing in any of the States or Territories, and for their removal west of the Mississippi River." The first and second sections of the act authorized the President of the United States to *exchange* certain lands west of the Mississippi River with any tribe or nation of Indians residing within the limits of any of the States or Territories, and with which the United States had existing treaties, for the whole or any portion of the territory claimed or occupied by such Indians. The third section of the act was in these words:

"And be it further enacted, that in the making of any such *exchange or exchanges,* it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guarantee to them and their heirs or successors, the country so *exchanged* with them, and if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same; *Provided always* that such lands shall revert to the United States if the Indians become extinct *or abandon the same.*"

---

* 7 Stat. at Large, 156, 195.        † Ib. 311, 414.        ‡ 4 Id. 411.

Afterwards, on the 29th of December, 1835, and *while this act was in full force*—the United States, being in possession of a certain 800,000 acres of land west of the Mississippi, known as the "Neutral Lands"* (part of the cession made by France to us April 30th, 1803,† originally occupied by the Osage tribe, but of all their right in which the said tribe had in 1825‡ made a cession to the United States)—the President negotiated a *treaty* with the Cherokees.§

The treaty contains these provisions:

"ARTICLE 1. The Cherokee nation hereby cede, relinquish, and convey to the United States all the lands owned, claimed, or possessed by them east of the Mississippi River . . . for and in consideration of the sum of $5,000,000, to be expended, paid, and invested in the manner stipulated and agreed upon in the following articles, &c.

"ARTICLE 2. Whereas by the treaty of May 6th, 1828, and the supplemental treaty thereto of February 14th, 1833, with the Cherokees *west of the Mississippi*, the United States guaranteed and secured to be conveyed by patent to the Cherokee nation of Indians the following tract of country [described as in the treaty of 1833, and then quoting the following words from the treaty:] 'which will make 7,000,000 of acres. . . . In addition . . . the United States further guarantee to the Cherokee nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said 7,000,000 acres, as far west as the sovereignty of the United States and their right of soil extend.' . . . And whereas it is apprehended by the Cherokees that in the above cession there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west of the Mississippi, the United States, in consideration of the sum of $500,000, therefore, hereby covenant and agree to *convey to the said Indians and their descendants, by patent in fee simple*, the following additional tract of land [described], estimated to contain 800,000 acres of land.

---

* The name, "Neutral Lands," seems to have been given in consequence of the tract having been originally one interposited between the white inhabitants of Missouri and the more wild and fierce portion of the Osages on the west.

† 8 Stat. at Large, 200.          ‡ 7 Id. 240.          § Ib. 478.

· "ARTICLE 3. The United States also agree that the lands above ceded by the treaty of February 14th, 1833, including the outlet and those ceded by this treaty, shall all be *included in one patent executed to the Cherokee nation of Indians by the President of the United States, according to the provisions of the act of May 28th,* 1830."

By an act making appropriations " for carrying into effect certain Indian treaties," approved July 2d, 1836,* Congress appropriated :

· "For the amount stipulated to be paid for the lands ceded in the first article of the treaty with the Cherokees of the 29th of December, 1835, deducting the cost of the land to be procured for them west of the Mississippi River, under the second article of said treaty, $4,500,000."

On the 31st December, 1838, the President, referring to the already mentioned treaties of May 6th, 1828, February 14th, 1833, and December 29th, 1835, and professing to act " in execution of the agreements and stipulations contained in the said several treaties," issued a patent giving and granting the 800,000 acres of land described in the treaty of 1835, " unto the said Cherokee nation," . . . to have and to hold the same, together with all the rights, privileges, and appurtenances thereunto belonging, unto the said Cherokee nation forever.

The grant, however, which included a large body of lands not part of the Neutral Lands, or conveyed under the treaty of 1835, was made

" Subject to the condition provided by the act of Congress of 28th May, 1830, and which condition is that the lands hereby granted shall revert to the United States, if the said Cherokees become extinct or *abandon* the same."

On the breaking out of the rebellion the Cherokee Indians generally favored it. Some of them actually joined the rebel army, though a portion of these afterwards deserted and entered the army of the United States.

---

* 5 Stat. at Large, 73.

On the 5th of July, 1862, Congress, by its Indian Appropriation Act of that year, provided :*

"That in cases where the tribal organization of any Indian tribe shall be in actual hostility to the United States, the President is hereby authorized to declare all treaties with such tribe to be abrogated by such tribe, if, in his opinion, the same can be done consistently with good faith, and legal and national obligations."

This power thus intrusted to the President he did not' use, and the treaties with the Cherokee Indians remained in force, notwithstanding the rebellion.

On the 3d of March, 1863,† by the fourth section of the Indian Appropriation Act, the President was authorized to enter into negotiations with various Indian tribes for the purchase of the lands occupied by them in the State of Kansas. The section was thus :

" And be it further enacted, that the President of the United States be, and he is hereby authorized to enter into treaties with the several tribes of Indians respectively, now residing in the State of Kansas, providing for the extinction of their titles to lands held in common, within said State, and for the removal of such Indians of said tribes as hold their lands in common, to suitable localities elsewhere within the territorial limits of the United States, and outside the limits of any State."

After the close of the rebellion, the act of March 3d, 1863, being still in force, the President of the United States entered into negotiations with the Cherokee Indians for that part of their land situate in the State of Kansas. The result of such negotiations was a treaty known as that of July 19th, 1866. This treaty, which is entitled " Articles of *agreement* and convention," is voluminous, and relates to many subjects. Its preamble recites that "existing treaties between the United States and the Cherokee nation are deemed insufficient," and that " the contracting parties *agree* as follows." Article seventeen provides thus :

"The Cherokee nation cedes in trust to the United States

---

* 12 Stat. at Large, 528.                          † Ib. 793.

the parcel of land in the State of Kansas, which was sold to the Cherokees under provisions of the second article of the treaty of 1835, and also that strip of the land ceded to the nation by the fourth article of said treaty, which is included in the State of Kansas, and the Cherokees consent that said land may be included in the limits and jurisdiction of the said State.

"The lands herein ceded shall be surveyed as the public lands of the United States are surveyed under the direction of the Commissioner of the General Land Office, and shall be appraised by two disinterested persons, one to be designated by the Cherokee National Council, and one by the Secretary of the Interior, and in case of disagreement, by a third person to be mutually selected by the aforesaid appraisers. The appraisement to be not less than an average of one dollar and a quarter per acre, exclusive of improvements.

"And the Secretary of the Interior shall from time to time, as such surveys and appraisements are approved by him, after due advertisement for sealed bids, sell such lands to the highest bidder for cash, in parcels not exceeding one hundred and sixty acres, and at not less than the appraised value, provided, that whenever there are improvements of the value of $50 made on the land not being mineral, and owned and personally occupied by any person for agricultural purposes at the date of the signing hereof, such persons so owning and in person residing on such improvements, shall after due proof made under such regulations as the Secretary of the Interior may prescribe, be entitled to buy at the appraised value the smallest quantity of land in legal subdivisions, which will include his improvements, not exceeding in the aggregate one hundred and sixty acres, the expenses of the sale and improvement to be paid by the Secretary out of the proceeds of sale of said land. [Provided that nothing in this article shall prevent the Secretary of the Interior from selling the whole of said lands not occupied by actual settlers at the date of the ratification of this treaty, not exceeding one hundred and sixty acres to each person entitled to preemption under the pre-emption laws of the United States, in a body, to any responsible party for cash, for a sum not less than one dollar per acre."]*

---

* The proviso in brackets was not in the treaty as originally signed, but another, in some respects less extensive, for which the one in brackets was substituted.

The twenty-ninth article of the treaty read thus:

"The sum of $10,000, or so much thereof as may be necessary to pay the expenses of the delegates and representatives of the Cherokees invited by the government to visit Washington for the purpose of making this treaty, shall be paid by the United States on the ratification of this treaty."

By an act passed on the 29th of July, 1866,* this provision was made:

"To enable the Secretary of the Interior to pay the reasonable costs and expenses actually paid or incurred by the delegates of the Southern Cherokees in coming to and going from Washington, and during their stay in and about the negotiation pending the confirmation of treaties with the Indian tribes, a sum not exceeding $10,000. *Provided*, that sum shall be refunded to the treasury *from the proceeds of the sales of the Cherokee Neutral Lands in Kansas.*"

The twelfth article of the treaty, section one, read thus:

"After the ratification of this treaty, and as soon as may be deemed practicable by the Secretary of the Interior, and prior to the first session of said council, a census or enumeration of each tribe, lawfully resident in said Territory, shall be taken under the direction of the Commissioner of Indian Affairs, who, for that purpose, is hereby authorized to designate and appoint competent persons, whose compensation shall be fixed by the Secretary of the Interior, and paid by the United States."

The Indian Appropriation Act of 1866† made this provision:

"For this amount, or so much thereof as may be necessary to enable the Secretary of the Interior to cause a census of each tribe to be taken, under the provisions of the twelfth article of the treaty of July 19th, 1866,—$2500."

The twenty-eighth article of the treaty read thus:

"The United States hereby agree to pay for provisions and clothing furnished the army, under Ap-pōthe-le-ha-la-le, in the winter of 1861–62, not to exceed the sum of $10,000 on the ac-

---

* 14 Stat. at Large, 326.    † Ib. 499.

count to be ascertained and settled by the Secretary of the Interior."

The thirtieth article thus:

" The United States agree to pay to the proper claimants, all losses of property by missionaries, or missionary societies, resulting from their being ordered or driven from the country by United States agents, and from their property being taken and occupied or destroyed by United States troops, not exceeding in the aggregate $20,000, to be ascertained by the Secretary of the Interior."

The Indian Appropriation Act of Congress, just mentioned, contains appropriations*

. " For provisions and clothing furnished the army under Appothe-le-ha-la-le in the winter of 1861–62, *per twenty-eighth article of the treaty of July 19th*, 1866, $10,000.

" For paying of losses of property by missionaries or missionary societies, &c., *treaty July 19th*, 1866, *thirtieth article*, $20,000."

These and other acts† appropriated in the aggregate $84,825 to carry the treaty into effect.

After this treaty of 1866 was ratified and proclaimed, Mr. Harlan, while Secretary of the Interior, made an agreement with the American Emigrant Company for the sale of the Cherokee Neutral Lands to them. By this agreement Mr. Harlan " agrees to sell, and hereby does sell," to the company, the whole tract of 800,000 acres, known as the " Cherokee Neutral Lands," with the restrictions set forth in the seventeenth article of the treaty of 1866, at $1 per acre, payable in instalments.

" The United States agree to cause said lands to be surveyed as public lands are usually surveyed, in one year from the date hereof, and on the payment of $50,000, to set apart for said company a quantity of said lands, in one body, in as compact form as practicable, extending directly across said tract of land, from east to west, and containing a number of acres equal to the number of dollars then paid, and from time to time to convey the same by patent, to said company or its assigns, when-

---

* 14 Stat. at Large, 499.         † See Ib. 513; 16 Id. 359, 569.

ever afterward requested so to do, in such quantities, by legal subdivisions, as said company shall indicate; and on the payment of each additional instalment, with interest as herein stipulated, to set apart for said company an additional tract of land, in compact form, where said company may request, but extending directly across the said Neutral Lands from east to west, containing a number of acres equal to the number of dollars of principal thus paid, and to convey the same to said company or its assigns, as hereinbefore described; and so on, from time to time, until the whole shall be paid; and no conveyance of any part of said lands shall be made until the same shall be paid for as provided in this agreement, but said company may make payments at earlier periods than those indicated, or pay the whole, principal and interest, and receive titles of tracts of land accordingly, if they shall so elect."

Mr. Browning, the successor in office of Mr. Harlan, disapproved of the sale before it had been consummated, and "agreed," October 9th, 1867, with a certain Joy to sell the same lands to *him*. This matter attracted the attention of Congress. The House of Representatives accordingly, on the 11th of December, 1867, passed a resolution calling on Secretary Browning for information with regard to the sale. The secretary answered the inquiries.

The conclusion of Congress being that the original treaty of 1866 had not made such provisions as would produce for the Indians the greatest amount of money, the Indian commissioners were summoned a second time to Washington. A supplemental treaty was now made (April 27th, 1868), between the United States and the Cherokees. This treaty refers to the sales to the Emigrant Company and to Joy; and recites that for the purpose of harmonizing all interests the company was about to assign their contract to Joy, and agrees that this shall be done and that Joy shall cancel and relinquish his contract made with Mr. Browning.

It then agrees that whenever Joy shall have cancelled and relinquished this contract with Mr. Browning, and shall have accepted the assignment of this contract with the Emigrant Company and entered into a contract with the Secretary of the Interior to assume and perform the obligations

of the company under it, the contract thus assigned, with some modifications as to the time, &c., of payments, shall stand. This treaty was proclaimed June 10th, 1868.

*Two days before the ratification*, that is to say on the 8th of June, 1868, Mr. Browning and Joy entered into a new contract, reciting Joy's acceptance of the Emigrant Company's obligation (which in terms Joy assumed); reciting further the surrender and cancellation of Joy's old contract, and Mr. Browning, as secretary, agreeing that he would carry out and execute all the provisions of the Emigrant Company's contract, except so far as modified by the supplemental treaty, and " cause patents of said lands to be issued to the said Joy or his assigns in accordance with the terms and provisions thereof."

By the Indian Appropriation Act of July 27th, 1868,* Congress enacted—

" That the sum of $10,356 be appropriated from any money in the treasury not otherwise appropriated, to enable the Secretary of the Interior to defray the expenses of the Cherokee delegation to Washington, District of Columbia, during the year 1867, *Provided that this sum be refunded to the Treasury of the United States out of that portion of the proceeds of the sale of the Cherokee Neutral Lands applicable to Cherokee national purposes.*"

Afterwards, by the Indian Appropriation Act of 1871,† Congress made certain provisos, in the following terms :

" Provided that hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power, with whom the United States may contract by treaty ; *Provided further*, that nothing herein contained shall be construed to invalidate or impair the obligations of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe."

On the 31st of October, 1868—that is to say, after the treaty of 1868 (the supplemental treaty), had been proclaimed, and after the act of July 27th, 1868, had been passed—Joy consummated his purchase of the Cherokee

---

* 15 Stat. at Large, 223.          † 16 Id. 566.

Neutral Lands, and the same were patented to him or his assignee.

At the time when Joy's purchase was thus made, the Indian Intercourse Acts (acts of 1802 and 1834) provided : *

" That no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same shall be made by treaty or convention entered into pursuant to the Constitution."

Another law, also, passed January 9th, 1837,† enacted :

§ 1. " That all moneys received from the sale of lands, that have been or *may be hereafter ceded to the United States by Indian tribes by treaties*, providing for the investment or payment to the Indians, parties thereto, of the proceeds of the lands ceded to them respectively, after deducting the expenses of survey and sale, any sum stipulated to be advanced, and the expenses of fulfilling any engagement therein, shall be paid into the treasury of the United States, in the same manner that moneys received from the sale of public lands are paid into the treasury.

§ 2. " That all sums that are or *may* be required to be invested by said treaties are hereby appropriated in conformity with them, and shall be drawn from the treasury as other public moneys are drawn therefrom, under such instructions as may from time to time be given by the President."

In this state of facts and of statutory law, one Holden filed a bill in the court below against Joy, setting up that a title had accrued to him to enter a certain quarter-section of a tract of the lands already mentioned, to wit, the Neutral Lands, sold as abovesaid to Joy. The bill alleged that the land claimed was, on the 12th of February, 1867, public land, to which the Indian title had been extinguished ; that he, the complainant, having the qualifications of a pre-emptor, on that day settled upon it and took possession of the same ; that he had acquired the legal and equitable right to enter the same at the proper land office under the pre-

---

* See 2 Stat. at Large, 143, § 12 ; 4 Id. 730, § 12.          † 5 Id. 135.

emption laws; that he then made settlement for the purpose of entering it under the said laws, and then took and had ever since had, and now had, open, notorious, adverse, exclusive, and rightful possession of the premises; that at the time he took possession the tribe of Cherokee Indians did not live in the State, and had not since lived there; that no individual Indian of the tribe lived on or near the premises, and that the tract was never settled upon by any person until it was taken possession of by him, the complainant; that he took possession of the land at the time and had continued to occupy it, without any objection from the tribe of Indians or any one of the members of the tribe; that he was the head of a family and a citizen of the United States, &c., &c.

He admitted, however, that there was no public survey of the tract returned and approved until a later period; that no plat or survey of the tract made by authority had ever been returned to the office of the register and receiver, or to the office of the Surveyor-General; that the only record of the survey was in the office of the Commissioner of the General Land Office; and that no instructions had ever been given to the register and receiver respecting the tract by the Secretary of the Interior. But he alleged that he had at all times been and still was ready and willing to make proof before the register and receiver of his settlement and improvement upon the tract, and to pay therefor the price of $1.25 per acre, and that he had tendered such proof and payment, and that the register and receiver had, at all times, refused to take such evidence or to accept pay for the land.

He averred that a right had thus accrued to him to enter the said lands under the pre-emption laws of the United States, and the grievance alleged was that the respondent had commenced an action of ejectment against him for the purpose of ejecting him from the land. He prayed an injunction against the ejectment, and for other relief.

The bill also set forth in considerable fulness what it alleged was the title claimed by the respondent, and averred that there was no other authority of law for the issuing of

the patent of the 31st of October, 1868, to the respondent, under which he claimed the premises in controversy, than the several patents, treaties, and contracts set forth and referred to in the bill of complaint; the same essentially as those mentioned in the preceding statement.

The respondent demurred : (1.) Because the facts set forth in the bill did not constitute a cause of action.   (2.) Because they were not sufficient to entitle the complainant to any relief in a court of equity.   (3.) Because the bill, if true, showed that the complainant had a complete and adequate remedy in a court of law.

The court below sustained the demurrer, and dismissed the bill, whereupon the complainant appealed to this court.

The case was elaborately argued by Messrs. *William Lawrence, of Ohio, and B. F. Butler,* for the complainant, and by Messrs. *B. R. Curtis and W. P. Hale,* contra.

*For the appellant :**

The treaty of 1835 was made in pursuance of the act of Congress of 1830.   It refers to that act specifically in its third section, and proposes to proceed "according to the provisions" of it.†   By the treaty, then, the eastern Cherokees "*exchanged*" their lands for a possessory right in common with the western ones, in the 7,000,000 acres, in the "outlet," in "the neutral lands," and in $4,500,000 in money.   They acquired no higher title than a possessory right; the sort of right they gave up.   They paid no money. The United States received none, but did agree to pay out of the treasury five millions less half a million.   There was an exchange of possessory rights; nothing else.   In pursuance of that treaty a patent was issued in accordance with the act of 1830, and only on *condition* that the lands should

---

* The introductory and first five subsequent points were made by Mr. Lawrence, the sixth by Mr. Butler.  All were elaborately argued, and with a learned citation of authorities.   A copy of Mr. Lawrence's brief (152 pp. 8vo.) is in the Law Library of Congress, chapter 18, No. 2.

† *Supra*, p. 214, top of the page.

" revert to the United States if the said Cherokees should become extinct or *abandon* the lands." Now, on the ratification of the treaty of July 19th, 1866, by which the whole of the lands were given up to the United States, and the Secretary of the Interior authorized to sell them all, where not occupied by actual settlers, the possessory right of the Cherokees was extinguished. On the ratification of the treaty they "abandoned the lands." The lands reverted to the United States and became open to pre-emption.

It will not be denied that Holden's claim is good if the sale to Joy was not good. Was this sale then good, or not so ?

We maintain certain legal propositions, any one of which, if true, destroys the title of Joy:

1. *An act of Congress is necessary before the treaty, survey, selection of lands, receipt of payment therefor, or the performance of the treaty trust to sell can be executed.*

That the treaty does not *ex proprio vigore* convey a fee simple legal title to Joy is obvious. It is in form a mere agreement, and should be construed to be no more; for if it is to operate as a law *in form*, even for the purpose of authorizing a sale, or the acts necessary to survey the lands, and select and separate the three classes into which the treaty divides them and receive payment, it operates on a subject the whole of which is intrusted to Congress by the Constitution. Assuming that it will be construed but as an agreement, it cannot be executed without the aid of an act of Congress passed for that purpose. This is settled by the courts.*

2. *Joy has acquired no fee simple or legal title, because there is no authority—by treaty or otherwise—to issue a patent.* A patent issued without authority of law, all will admit is void; and the courts may inquire into conflicting claims resting on questions of law. The treaty of July 19th, 1866, is silent on the subject of a patent or of the mode in which the title held by the United States shall pass. The supplemental treaty professes to ratify a *contract* on file in the Department

* Foster & Elam *v.* Neilson, 2 Peters, 253; United States *v.* Arredondo, 6 Peters, 691.

of the Interior.   The most that can be claimed for the treaty and the contract is that they gave an inchoate right.

3. *The Cherokee treaty could not constitutionally impose the official duties, or confer the official powers on executive officers necessary to execute it, so as to convey a title to lands.*

These officers are created by acts of Congress for specific purposes and their powers are defined and limited.   The treaty power cannot usurp legislative power or interrupt and prevent the performance of duties imposed by the latter power on officers whose offices are established by law.   Each power must move in its own orbit.   Neither can do that which would retard, impede, burden, or in any manner control the other.

Now, this treaty attempts to confer various powers on, and require duties of, the Secretary of the Interior, the Commissioner of the General Land Office, &c.   The performance of these duties are prerequisite to the issuing of a patent. If they were unauthorized, no patent can issue by reason of them.   They could have no more effect than if performed by a stranger.

4. *The Cherokee treaty, so far as it stipulates for a disposition of lands, is void, because in conflict with the act of July 22d, 1854, and to the act of June 2d, 1862.*

The former act* provides:

" That all the lands to which the Indian title has been or shall be extinguished, within said Territories of Kansas and Nebraska, shall be subject to the operations of the Pre-emption Act of 4th September, 1841."

The latter,† extending the provision to all lands of the government, enacts in the broadest language, that—

"*All the land belonging to the United States, to which the Indian title has been or shall be extinguished, shall be subject to the operation of the Pre-emption Act of the 4th of September,* 1841; *Provided, however,* that when *unsurveyed lands* are claimed by pre-emption, notice of the specific tracts shall be filed within six months after the survey has been made in the field."

---

* 10 Stat. at Large, 310, § 12.                    † 12 Id. 413.

Whether this treaty of 1866 rest on a power given by the Constitution or on one given by acts of Congress, the two acts cited, which dedicated these lands to pre-emption settlement, are superior to it, and in case of a conflict are supreme. The Constitution ordains that—

" The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

These acts, being regulations respecting the territory named, are of necessity " regulations" also of the treaty power.

If it should be conceded that the treaty power—the President and Senate—cannot be regulated in any respect; that they are over and above all law; yet the Commissioner of the General Land Office and the Secretary of the Interior— mere statutory officers—are not beyond the control of law. The acts of 1854 and 1862 operated as a regulation of and restraint on their powers. If so, they could perform no duty in opposition to these acts. For if this is not so, then the treaty power can repeal the laws creating the Interior Department and set up a land office of its own.

5. *An Indian treaty which undertakes to dispose of the public lands without the authority of an act of Congress is unconstitutional and void.*

The Constitution, in substantially the same form in which it delegates express and exclusive powers to the President and to the Supreme Court, delegates to Congress the power, as we have seen, " to dispose of the territory . . . belonging to the United States."

No reason can be given to sustain the treaty power in an attempt to destroy the authority of Congress to dispose of the public lands, which will not equally sustain the treaty power in an effort to annihilate the executive power of pardon, appointments to office, to command the army, &c., and the power of this court to exercise its original jurisdiction.

6. *The treaty was promulgated on the 10th of June, and Mr.*

*Secretary Browning signed the contract upon the 8th, that is to say, two days before its promulgation.*

*Messrs. B. R. Curtis and W. P. Hall, contra:*

The treaty of 1835 was not negotiated by force of the act of 1830. That treaty is not one to lay off a district west of the Mississippi, and " exchange " it for a district or lands east of the Mississippi. It is a treaty to purchase the lands of the Cherokees for $5,000,000, and a further agreement to sell the Neutral Lands to the Cherokees, 800,000 acres, for the consideration of $500,000 to be paid therefor. Neither of those objects was within the act of 1830, or authorized thereby. The treaty was made under the treaty-making power, by the President and Senate, and by and under that power alone. That Congress so regarded the treaty is shown by the Appropriation Act of July 2d, 1836,* where Congress ratified and interpreted the treaty, so far as Congress could ratify or interpret a treaty. The act refers both to the article by which the eastern lands were *bought* for $5,000,000, and to the article by which the neutral or western lands were *sold* for $500,000. Both the articles are designated in that act by Congress, and one is treated as a purchase, and the other as a sale. The Indians, indeed, paid no money. They had no occasion to pay any money.; they bought the land of their debtor, and they extinguished so much of the debt as the price of the land amounted to.

The United States, as already said, stipulated, by the treaty of 1835, to sell these lands, and make a valid title in fee simple to the Cherokee nation of Indians. Nothing was said in that article of the treaty (and certainly nothing can be implied) concerning any conditions which were to be inserted in the patent. Nevertheless, when the patent was issued, it embraced not merely the Neutral Lands, but other large tracts of lands, which were to be conveyed independent of these Neutral Lands. And it contained two conditions; that the land should revert to the United States provided the nation should become extinct, or the land should

* See *supra*, p. 214.

be abandoned by the nation. Now, the first of these conditions is one which would be silently engrafted on the grant independent of any express words. When there is a grant and the grantee and his heirs become extinct the land escheats to the state, whether the grantee be an individual or a body of individuals. Therefore, we need not quarrel with the first condition. But the other condition—that in regard to the abandonment of the land—is one, which if it were necessary, we could show was wholly unwarranted by the article in the treaty, which stipulated absolutely—not conditionally, but absolutely—to make a title in fee simple. But the matter is unimportant, because there has been no abandonment. A conveyance to a trustee to sell for the benefit of the grantor is not an abandonment.

Whether the President could have issued his proclamation, and declared the treaty with the Cherokees terminated by their having gone over to the rebels, we need not consider. He never issued any proclamation in regard to the treaties in force with the Cherokees. On the contrary, in the year 1866, immediately after the war, this treaty of June 19th was made with the Cherokee nation. And the United States never did insist upon the prior hostility of the Cherokees, nor attempt to insist upon it, for any purpose. Now, if it be a condition lawfully inserted in this patent, that if the Cherokees should abandon the lands, they shall revert to the United States, it is a condition subsequent, and no one but the United States can take advantage of it. If it be a lawful condition, the United States could enter through its officers for the breach of that condition, or the United States might waive the breach, and release the condition itself. And by this treaty they have done both; because they have accepted a cession of those lands from the Cherokees in trust to sell them for the benefit of the Cherokees. After this, manifestly not the United States themselves could take advantage of a breach of this condition, or insist on its existence for any purpose. *A fortiori*, a mere stranger to the title could not do so.

So the title stood when the treaty of 1866 was made. Now

consider how far, and with what effect, Congress has inter-
posed in reference to this treaty of 1866, and the supple-
mental article of 1868, by which this title was acquired.

We see in the first place, the negotiation of the original
treaty; the recognition of that fact by Congress, in making
an appropriation for the expenses, and in making other ap-
propriations under the treaty, specifying the articles to carry
out what was promised in the treaty by those articles. We
find also that in doing this, Congress has expressly provided,
that although these moneys are to be thus advanced out of
the treasury, they are to be reimbursed from the sales of
"neutral lands." What neutral lands? Only these. What
sales? Those provided for in the treaty. The principal treaty
bore date on the 19th day of July, 1866. The provisions
just referred to, for the payment of the expenses of the com-
missioners and other obligations, applied to expenses accru-
ing in the negotiation of that treaty. But the commission-
ers had again been summoned to negotiate the supplemental
article; they had come here some time in the year 1867,
having concluded their labors in April, 1868, and then a
provision is made by an act of the 27th of July, 1868, to pay
*their* expenses. This last act contains the proviso:

"That this sum be refunded to the treasury of the United
States *out of that portion of the proceeds of the sale of the Cherokee
Neutral Lands in Kansas, applicable to Cherokee national purposes.*"

The additional article of the treaty was concluded on the
27th of April, 1868. It was proclaimed the 10th of June,
1868. So that, on the 27th of July, 1868, when Congress
made this provision for deducting the amount of that appro-
priation out of the proceeds of the sales of the Cherokee
Neutral Lands, it could refer to nothing except this very sale
to Joy, which is now under consideration; because, that sup-
plemental article had a provision that a contract should be
made by Joy to perform all that the land company had
agreed to perform, with some modifications, and that the
lands *should be patented to him* under that contract, as fast as
they should be paid for.

So far as to the legislative history of this title. We pass now to the pretensions which are set up here on the part of the counsel of the appellant.

The learned counsel rely on several "legal propositions," which they seek to maintain.

It is said in the first and second places, that an act of Congress is necessary before the performance of the treaty trust can be performed; that this treaty does not *ex proprio vigore* convey any title to Joy; that it does not contain any patent to Joy, nor provide for the issue of any to him. But it is not consistent with the nature of the transaction that it should so convey, or contain such a patent. It contains a cession of the land to the United States, and that cession is made to the United States in trust to sell. A sale had been agreed upon between Joy and the Secretary of the Interior, at the time when the supplemental article was negotiated. That sale by the Secretary of the Interior, under the trust, to Joy, is described and ratified and approved of in this supplemental article. Now, to say that this supplemental article does not convey the lands to Joy, is to state what is true but entirely consistent with what the treaty provides for, namely, that the secretary was to convey them to him, by patent, in the name of the United States, in whom the legal title had been vested by the treaty.

It is further insisted, in the third place, that the validity of these proceedings cannot be maintained because the Secretary of the Interior, and the Commissioner of the Land Office, are required to do something; that the treaty is invalid because these public officers are to do something under the treaty. It would be an unusual sort of treaty, under which some public officer was not to do something. If the President and the Senate have the power to make such a treaty as this, and the stipulations in the treaty are what this court must consider them to be—appropriate stipulations—then is it to avoid this treaty that the Secretary of the Interior is to perform certain acts, and the Commissioner of the Land Office certain other acts? Congress, in 1837, legislated generally on this class of subjects, namely, cessions by Indians

in trust.* They speak of them as having been theretofore made; and they show the expectation that they will be thereafter made; they speak of surveys, and the expenses of surveys, of the sales and the expenses of the sales, and provide how they shall be taken out of the proceeds. Certainly, if there were to be surveys and sales, and other expenses, there must be somebody to make surveys, and somebody to make the sales, and somebody to incur the expenses, all of which is plainly contemplated, in this act of Congress, regulating these cessions in trust. And why not the Secretary of the Interior? All these Indian affairs belong to his department. He is the appropriate officer to have the supervision over this subject, and see that the stipulations of this treaty are carried out fairly and effectually on behalf of the contracting parties. Why should he not be selected under the treaty-making power? It is argued that the treaty cannot appoint an officer. That may be true; but if the treaty finds him already appointed and charged with a class of duties, one of which, under the treaty, falls naturally and properly under his office, why, in the name of all that is practicable, should he be not charged with the duty of performing it? The Commissioner of the General Land Office was also to do something. The law of Congress foresaw that the commissioner would be called upon to do something under treaties of this kind, and accordingly an act was passed on the 8th of April, 1864, which requires him to have the necessary surveys made. On the 28th day of July, 1866, another act was passed, making an appropriation for the expenses of these and other similar surveys. This treaty was dated in April, and was promulgated in June. The act contains this provision:

"For surveying Indian and other reservations under treaty stipulations at not exceeding $15 per mile from boundaries, $10 for townships, and $8 per mile for sections; $50,000."

We got the money, then, to make these surveys by the will of Congress, and by the act of the 8th of April, 1864,†

---

* See *supra*, p. 221.          † 13 Stat. at Large, 41.

already referred to, will be found a law providing that when it should become necessary to survey Indian lands, they shall be surveyed under the Commissioner of Public Lands in the same manner that public lands of the United States are surveyed, which is precisely what they stipulated for in this treaty, viz., that these surveys were to be made under the direction of the commissioner in the manner the surveys of the United States lands are made.

Then in the fourth place it is said, that at the date when the appellant entered upon this land, *the land was public land of the United States, subject to pre-emption.* That is what the opposite counsel undertake to maintain. If they can maintain that, they can succeed. If they cannot maintain that, they must fail. And the inquiry is, whether they can?

The counsel argue that by an act passed on the 22d of July, 1854, there is a provision, which they consider applicable to this case,

" That all the lands to which the Indian title has been or shall be extinguished within said Territories of Nebraska and Kansas, shall be subject to the operations of the Pre-emption Act of the 4th of September, 1841, under the conditions, restrictions, and stipulations therein mentioned."

Now, turning to the Pre-emption Act thus referred to,* we find,

" That from and after the passage of this act, every person, being the head of a family, or widow, &c., &c., having filed his declarations, who since the 1st day of June, 1840, has made, or shall hereafter make a settlement in person, *on the public lands to which the Indian title had been at the time of such settlement extinguished."*

There are two requirements, and both of them are essential. First, that it should be public lands of the United States; and secondly, that the Indian title should be extinguished.

These were not public lands of the United States. The

---

* 5 Stat. at Large, 455.

United States had sold them to the Cherokee nation of In-
dians for a valuable and adequate consideration years before,
covenanting that they should have a good title in fee simple,
and that title remained in the Indians down to the time
when the treaty of 1866 was negotiated. That treaty either
took effect or it did not take effect. If it did not take effect,
the title remained in the Indians. If the objections which
have been taken here were sufficient to show that that entire
seventeenth article of the treaty was void, certainly it cannot
be both void and valid; valid to transfer the legal title to
the United States, and void to declare the sole purpose of
the conveyance. If void, the title remained, as already said,
in the Indians. If valid, the legal title passed to the United
States; *but the title of the Indians was not extinguished within the
meaning of this Pre-emption Act.* If a man conveys land to a
trustee in trust to sell it, he passes his legal title to such
trustee, but he does not *extinguish* his title. He is still the
beneficial owner of that land, and continues to be so until
the trust has been executed, and the title is passed in con-
formity to it; and so it must be here.

So far from its being true, that there is anything illegal in
the nature of this trust or the manner in which it is declared
by an Indian treaty, so long ago as the year 1837, it was so
much a recognized part of the policy and practice of this
government to accept cessions of Indian lands in trust by a
treaty, and to sell them and hold the proceeds for the benefit
of the Indians, that the subject is regulated by a general
law of Congress; a law passed on the 9th of January, 1837
[see the act quoted *supra*, p. 221]. The act makes a regu-
lation of this general subject, recognizing the fact that such
treaties had been theretofore made, and were expected to be
thereafter made; and pointing out that after deducting from
the proceeds of sales provided and stipulated for by such
treaties, the expenses, the balance was to be put into the
treasury of the United States in the same manner as the
proceeds of sales of public lands.

Indeed, so much was it a matter of course, that such trea-
ties should be made, so much were they expected to be made

frequently, and so just and proper was it considered that they should be made and their stipulations carried into effect, that in the latter clause of the section, as will be seen on reference to it,* there is a general sweeping appropriation covering everything which should be stipulated by such treaties; an instance of legislation for the appropriation of moneys in advance of treaties such as cannot be found anywhere else in the history of this government.   So that if there is a distinction to be made between treaties of this character and designed for this purpose, and other treaties, they are placed by this legislation of Congress even higher than any other class of treaties.

Then, it is said, that an Indian treaty cannot vest in an individual a valid title to Indian lands of which the United States had the ultimate fee subject to the usual Indian title of occupancy.   Why not?   "Because the Constitution says that Congress shall have power to dispose of and make all needful rules and regulations concerning the territory and property of the United States."   Granted.   But how is Congress to dispose of the property of the United States, including the public lands?   Congress can only legislate. Congress can dispose by manifesting its will, and only in that way.   Now, Congress *has* manifested its will in regard to the acquisition of titles to Indian lands by Indian treaties. From the beginning of the second year of this government down to the year 1871, when Congress passed an act concerning Indian treaties, to which reference will be made presently, the will of Congress was manifested; and it was manifested to the effect, not only that individuals could acquire titles to Indian lands by Indian treaties, but that they could be acquired by nobody in any other way.

On the 22d day of July, 1790, an act was passed,†

"That no sale of lands made by any Indians, or by any nation or tribe of Indians within the United States, shall be valid to any person, or persons, or to any State, whether having a right to pre-emption of that land or not, *unless* the same shall

---

* *Supra*, p. 221.                    † 1 Stat. at Large, 138, § 4.

be made and duly-executed at some public treaty, held under the authority of the United States."

This was a temporary act, which lasted for two years, and until the end of the next Congress. Now, if we follow this down, we shall find in 1793,* an act still more explicit; though this, also, was only a temporary act. The language of the section is peculiar and very significant in reference to the subject we are now considering, and has always been continued in the legislation of Congress since,

"That no purchase or grant of lands, or any title or claim thereto, from any Indian, or nation, or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity *unless* the same be made by a *treaty or convention entered into pursuant to the Constitution.*"

Here is the will of Congress; and, by a series of acts, it is its established will; one passed in 1796,† another in 1802,‡ another in June, 1834.§ The last two are permanent laws concerning Indian intercourse.

From the earliest time then, in the history of this government, Congress, using the power which it had to dispose of the public lands, has manifested its will, that by an Indian treaty, and that by an Indian treaty only, title to Indian land could be acquired, either by States or private individuals, and Congress has said—when so manifesting its will—it must be by a treaty such as is provided for under the Constitution, thus showing its construction of what an Indian treaty was. Add to this the general law, already referred to, regulating these trusts of cession, and sales under them, and the disposition of the money, and the court has the whole subject of the acquisition of titles by individuals under Indian treaties so far as it depends on legislation; and in conformity with this legislation are the numerous decisions of this court, *to the effect that titles to Indian lands may be acquired by treaty.* And although by the act of 1871, Congress undertook to, and perhaps did, put an end to the tribal ca-

---

* 1 Stat. at Large, p. 330, § 8.    † Ib. 472.    ‡ 2 Id. 143.    § 4 Id. 730.

pacity of these dependent nations to negotiate further treaties, those already negotiated are expressly saved.

Then, next, it is said that the treaty was promulgated the 10th of June, and that Secretary Browning signed the contract on the 8th of June.

To this the answer is:

(1.) That as respects the rights and duties of each of the contracting parties, the treaty takes effect from its date;* and the act of Secretary Browning was intended to be in the discharge of a duty of the United States under the treaty.

(2.) The supplemental treaty did not require Secretary Browning to enter into any executory contract; it validated the contract of his predecessor, with modifications specified.

(3.) The lands having been patented to Mr. Joy, pursuant to the treaty, it is immaterial whether he held a valid written executory contract for such patents or not. Such a contract would not strengthen his title by patent, nor can the absence of such contract weaken it.

Mr. Joy purchased these lands of the government in good faith, and in accordance with the apparent and the real authority of the agents of the government to sell them. They have been patented to him, he has paid for them, and the purchase-money has been appropriated by Congress. Will this court say he has acquired no title?

Mr. Justice CLIFFORD delivered the opinion of the court.

Concessions made in the bill favorable to the respondent are to be regarded as facts undisputed by the complainant, and matters well pleaded, in favor of the complainant, are, in view of the demurrer, to be considered as facts admitted by the respondent. Viewed in that light, as the pleadings must be, it will be most convenient to inquire, in the first place, whether the title claimed by the respondent is a valid one, as if it is, the decree must be affirmed, and if it is not, the decree must be reversed, and the complainant may perhaps be entitled to relief.

---

* Haver *v*. Yaker, 9 Wallace, 32.

Disturbances, and in some instances collisions, of a threatening character, occurred between the Cherokee nation of Indians and certain citizens of the States or Territories in which they resided, in consequence of which the United States and the Cherokee nation became anxious to make some arrangement whereby the difficulties which had arisen by the residence of the Indians within the settled parts of the United States, under the jurisdiction and laws of the States or Territorial governments, might be terminated and adjusted.   Measures of various kinds had been devised and tried without effectually accomplishing the object, as will be seen by reference to some of the early treaties with that nation and the acts of Congress upon the subject.*

Treaties of the kind were concluded with that nation of Indians on the 6th of May, 1828, and on the 14th of February, 1833, in both of which the United States agreed to possess the Cherokees of seven million acres of land west of the Mississippi River, bounded as therein described, and to guarantee it to them forever, upon the terms and conditions therein stipulated and agreed.   Enough appears in those treaties to show that it was the policy of the United States to induce the Indians of that nation, resident in any of the States or organized Territories of the United States, to surrender their lands and possessions to the United States, and emigrate and settle in the territory provided for them in those treaties.   Sufficient is known, as matter of history, to justify the remark, that those measures, as well as some of like kind of an earlier date, were unsuccessful, and that the difficulties continued and became more and more embarrassing.†

Prior measures having failed to accomplish the object of quieting the disturbances or removing the difficulties, the United States, on the 29th of December, 1835, concluded a new treaty with the Cherokee nation, with a view to reunite their people in one body and to secure to them a permanent

* 7 Stat. at Large, 311; Ib. 414.

† The Cherokee Nation v. Georgia, 5 Peters, 15; Worcester v. Georgia, 6 Id. 515.

home for themselves and their posterity in the country se-
lected for that purpose, without the territorial limits of the
State sovereignties, and where they could establish and en-
joy a government of their choice, and perpetuate such a
state of society as might be consonant with their views,
habits, and condition.*

By the first article of the treaty the Cherokee nation
" cede, relinquish, and convey to the United States all the
lands owned, claimed, or possessed by them east of the
Mississippi River," and released all their claims for spolia-
tions of every kind, for and in consideration of the sum
of $5,000,000, to be expended, paid, and invested in the
manner stipulated and agreed upon in other articles of the
treaty.

Reference is made in the second article of the treaty to
the respective articles of the two before-mentioned treaties,
in which the United States agreed to possess the Cherokees
of seven million acres of land, situated and bounded as
therein described, and guaranteed it to them forever upon
the terms and conditions therein stipulated and agreed.
Apprehension, it seems, was felt by the Cherokees that the
cession contained in those treaties, and confirmed in the
new treaty, did not contain a sufficient quantity of land for
the accommodation of the whole nation on their removal,
and in view of that fact the United States, in consideration
of $500,000, covenanted and agreed to convey to the said
Indians and their descendants, by patent in fee simple, a cer-
tain tract of land, situated and bounded as therein described,
estimated to contain eight hundred thousand acres of land,
ever afterwards known as the Cherokee neutral lands, and
it is admitted in the bill of complaint that it includes the
tract in controversy.

Authority was conferred upon the President by the first
section of the act of the 28th of May, 1830, to cause so much
of any territory belonging to the United States, west of the
Mississippi, not included in any State or organized Terri-

---

* 7 Stat. at Large, 479.

tory, and to which the Indian title had been extinguished, "as he may judge necessary," to be divided into a suitable number of districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and to remove there, and to cause each of said districts to be so described by natural or artificial boundaries as to be easily distinguished from every other.

Power is also conferred upon the President by the second section of the act to exchange any or all of such districts with any tribe or nation of Indians residing within the limits of any of the States or Territories, for the whole or any portion of the territory, claimed and occupied by such tribe or nation, within the bounds of any one or more of the States or Territories, subject to certain conditions therein prescribed. Section three provides that in making such exchanges the President may solemnly assure the tribe or nation that the United States will forever secure and guarantee to them and their heirs and successors the country so exchanged with them, and that, if they prefer it, the United States will cause a patent or grant to be made and executed to them for the same, provided that such lands shall revert to the United States if the Indians become extinct or abandon the territory.

Much reason exists to suppose that Congress in framing those provisions had in view the stipulations of the treaty concluded two years earlier, and it is equally probable that the President and Senate in negotiating and concluding the two treaties of later date were largely governed by the several provisions in that act of Congress, but they were not controlled by these enactments, as is evident from the fact that the later of the two contains many stipulations differing widely from the provisions of that act, as for example the United States, in the supplemental article enlarging the quantity of land set apart for the accommodation of the nation, expressly covenant and agree to convey the additional tract to the said Indians and their descendants by patent, in fee-simple title, and the article does not contain any such provision as that contained in the third section of

the act of Congress, that the land shall revert to the United States if the Indians become extinct or abandon the territory.*

Attempt is made in argument to show that the last-named treaty was negotiated by force of the act of Congress to provide for an exchange of lands with the Indians, but it is clear that the proposition cannot be sustained, as the treaty differs widely in many respects from the provisions of that act of Congress. Doubtless the intent and purpose were the same —to quiet the disturbances and to induce the Indians remaining in the States and Territories to emigrate and settle in the district of country set apart for them without the limits of the several States and organized Territories—but the treaty, though concluded to promote the same object as the act of Congress, adopts very different instrumentalities. It is a treaty to confirm to the Indians the possession of the seven million acres of land previously granted to the nation, and to purchase their lands east of the Mississippi River for the sum of $5,000,000, to be expended, paid, and invested in the manner therein stipulated and provided.

Such prior grant of land was made or defined under the two treaties before mentioned to secure a new home for the Indians, without the limits of the several States and Territories, and to induce the Indians still residing within those limits to emigrate and settle in the country long before set apart for that purpose. Large numbers of the Cherokees emigrated and settled there under the treaty of the 8th of July, 1817, and measures of various kinds had been adopted, at later periods, to induce the residue of the nation to follow those who had accepted the proffered protection, but without much success.†

Even treaties proved ineffectual, as one after another failed to accomplish the desired end. They would not emigrate without compensation for their improvements, and many were reluctant to accept any of the terms proposed, upon the ground that the quantity of land set apart for the accom-

---

* 4 Stat. at Large, 412; 7 Id. 480.          † 7 Id. 156.

modation of the whole nation was not sufficient for the purpose. Twice the United States offered the seven million acres of land, with other inducements, but the terms, though formally accepted, did not have the effect to accomplish the end. Experience showed that better terms were required, and the government agreed to purchase their lands for the consideration named in the treaty and to convey to the Indians in fee-simple title, the additional tract of eight hundred thousand acres, for $500,000, to be deducted from the consideration stipulated to be paid for the purchase of their lands.

Other important stipulations are contained in the treaty, among which are the following: (1.) That the United States agree that the lands ceded shall all be included in one patent, executed by the President, to the Cherokee nation, according to the provision of the before-mentioned act of Congress. (2.) That the United States agree to extinguish, for the benefit of the Cherokees, the titles to the reservations within their country, made in the Osage treaty to certain half-breeds, and for that purpose the United States agree to pay to the persons to whom the titles belong the sum of $15,000, according to the schedule accompanying the treaty. (3.) That the United States shall pay the American Board of Commissioners for Foreign Missions for the improvements they have on the ceded country the sums at which the same shall be appraised, and that the money allowed for the improvements shall be expended in schools among the Osages, and for improving their condition. (4.) That the land ceded to the Cherokee nation shall, in no future time, be included, without their consent, within the territorial limits or jurisdiction of any State or Territory. (5.) That the United States agree to protect the Cherokee nation from domestic strifes and foreign enemies and against intestine wars between the several tribes. (6.) That the United States agree to remove the Cherokees to their new homes and to subsist them for one year after their arrival. (7.) That the United States shall liquidate claims for reservations and pay the sums awarded to the claimants; and many other stipula-

tions which were of great value and highly beneficial to the Cherokee nation.

Valid treaties were made by the President and Senate during that period with the Cherokee nation, as appears by the decision of this court in several cases.* Indeed, treaties have been made by the United States with the Indian tribes ever since the Union was formed, of which numerous examples are to be found in the seventh volume of the public statutes.† Indian tribes are States in a certain sense, though not foreign States, or States of the United States, within the meaning of the second section of the third article of the Constitution, which extends the judicial power to controversies between two or more States, between a State and citizens of another State, between citizens of different States, and between a State or the citizens thereof and foreign States, citizens, or subjects. They are not States within the meaning of any one of those clauses of the Constitution, and yet in a certain domestic sense, and for certain municipal purposes, they are States, and have been uniformly so treated since the settlement of our country and throughout its history, and numerous treaties made with them recognize them as a people capable of maintaining the relations of peace and war, of being responsible, in their political character, for any violation of their engagements, or for any aggression committed on the citizens of the United States by any individual of their community. Laws have been enacted by Congress in the spirit of those treaties, and the acts of our government, both in the executive and legislative departments, plainly recognize such tribes or nations as States, and the courts of the United States are bound by those acts.‡

Express power is given to the President, by and with the advice and consent of the Senate, to make treaties, provided

---

* United States v. Rogers, 4 Howard, 567.

† Cherokee Nation v. Georgia, 5 Peters, 17; Worcester v. Georgia, 6 Id. 543.

‡ Doe v. Braden, 16 Howard, 635; Fellows v. Blacksmith, 19 Id. 372; Garcia v. Lee, 12 Peters, 519.

two-thirds of the senators present concur, and inasmuch as
the power is given, in general terms, without any descrip-
tion of the objects intended to be embraced within its scope,
it must be assumed that the framers of the Constitution in-
tended that it should extend to all those objects which in
the intercourse of nations had usually been regarded as the
proper subjects of negotiation and treaty, if not inconsistent
with the nature of our government and the relation between
the States and the United States.*

Beyond doubt the Cherokees were the owners and occu-
pants of the territory where they resided before the first
approach of civilized man to the western continent, deriving
their title, as they claimed, from the Great Spirit, to whom
the whole earth belongs, and they were unquestionably the
sole and exclusive masters of the territory, and claimed the
right to govern themselves by their own laws, usages, and
customs.   Guided by nautical skill, enterprising navigators
were conducted to the New World.   They found it, says
Marshall, C. J., in possession of a people who had made
small progress in agriculture or manufactures, and, whose
general employment was war, hunting, and fishing.   Expe-
ditions were fitted out by all the great maritime powers of
the Old World, and they visited many parts of the newly
discovered continent, and each made claim to such part of
the country as they visited.   Disputes arose and conflicts
were in prospect, which made it necessary to establish some
principle which all would acknowledge, and which should
decide their respective rights in case of conflicting preten-
sions.   Influenced by these considerations they agreed that
discovery should determine the right, that discovery should
give title to the government by whose subjects, or by whose
authority, it was made, against all other governments, and
that the title so acquired might be consummated by posses-
sion.†   As a necessary consequence the principle estab-

* Holmes v. Jennison et al., 14 Peters, 569; 1 Kent, 166, 2 Story on
the Constitution, § 1508; 7 Hamilton's Works, 501; Duer's Jurisprudence,
229.

† Johnson v. McIntosh, 8 Wheaton, 573.

lished gave to the nation making the discovery the sole right of acquiring the soil and of making settlements on it. Obviously this principle regulated the right conceded by discovery among the discoverers, but it could not affect the rights of those already in possession, either as aboriginal occupants or as occupants by virtue of a more ancient discovery. It gave the exclusive right to purchase, but did not found that right on a denial of the right of the possessor to sell. Colonies were planted by Great Britain, and the United States, by virtue of the revolution and the treaty of peace, succeeded to the extent therein provided to all the claims of that government, both political and territorial. Throughout, the Indians as tribes or nations, have been considered as distinct, independent communities, retaining their original, natural rights as the undisputed possessors of the soil, from time immemorial, subject to the conditions imposed by the discoverers of the continent, which excluded them from intercourse with any other government than that of the first discoverer of the particular section claimed. They could sell to the government of the discoverer, but they could not sell to any other governments or their subjects, as the government of the discoverer acquired, by virtue of their discovery, the exclusive pre-emption right to purchase, and the right to exclude the subjects of all other governments, and even their own, from acquiring title to the lands.

Enough has already been remarked to show that the lands conveyed to the United States by the treaty were held by the Cherokees under their original title, acquired by immemorial possession, commencing ages before the New World was known to civilized man. Unmistakably their title was absolute, subject only to the pre-emption right of purchase acquired by the United States as the successors of Great Britain, and the right also on their part as such successors of the discoverer to prohibit the sale of the land to any other governments or their subjects, and to exclude all other governments from any interference in their affairs.* Evidently,

---

* Mitchel et al. *v.* United States, 9 Peters, 748.

therefore, the Cherokees were competent to make the sale
to the United States, and to purchase the lands agreed to be
conveyed to them by the second article of the treaty.  Both
parties concede that the title of the United States to the tract
known as the Cherokee neutral lands was perfect and com-
plete, and that the tract includes the land in controversy.
Title to that tract was acquired by the United States as a
part of the Louisiana purchase from the French Republic.
By the treaty between the United States and the French
Republic of April 30th, 1803, the chief executive officer of
that republic ceded the said territory to the United States,
with all its rights and appurtenances, forever.\*   When the
President took possession of the Territory the absolute fee-
simple title and right of sovereignty and jurisdiction became
vested in the United States as the successor of the original
discoverer, subject only to the Indian title and right of occu-
pancy as universally acknowledged by all the departments
of our government throughout our history.   All agree that
this land then, and for many years thereafter, was occupied
by the Osage Indians.   On the 2d of June, 1825, the Osage
tribes, by the treaty of that date, ceded to the United States
all their right, title, interest, and claims to the lands lying
. . . west of the State of Missouri, with such reservations,
and for such considerations, as are therein specified, which,
it is conceded, extinguished forever the title of the Osage
Indians to the neutral lands.†

Prior to the treaty of the 8th of July, 1817, the Cherokees
resided east of the river Mississippi.   Pursuant to that treaty
they were divided into two parties, one electing to remain
east of the Mississippi and the other electing to emigrate
and settle west of it, and it appears that the latter made
choice of the country on the Arkansas and White Rivers,
and that they settled there upon the lands of the United
States described in the treaty.‡

Possessed as the United States were of the fee-simple title
to the neutral lands, discharged of the right of occupancy

---

\* 8 Stat. at Large, 200.          † 7 Id. 240.          ‡ Ib. 157.

by the Osage Indians, it was clearly competent for the proper authorities of the United States to convey the same to the Cherokee nation. Subsequent acts of the United States show that the stipulations, covenants, and agreements of the treaty in question were regarded by all the departments of the government as creating binding obligations, as fully appears from the fact that they all concurred in carrying the provisions into full effect.* Appropriations were made for surveys, and surveys were ordered, and plats were made, and on the 1st of December, 1838, a patent for the land promised was issued by the President in full execution of the second and third articles of the treaty. Among other things it is recited in the patent that it is issued in execution of the agreements and stipulations contained in the said several treaties, and that the United States do give and grant unto the Cherokee nation the two described tracts of land as surveyed, containing the whole quantity therein mentioned: to have and to hold the same, together with all the rights, privileges, and appurtenances thereto belonging, to the said Cherokee nation forever, subject to certain conditions therein specified, of which the last one is that the lands hereby granted shall revert to the United States if the said Cherokee nation becomes extinct or abandons the premises.

Objection is made by the appellant that the treaty was inoperative to convey the neutral lands to the Cherokee nation, which may well be admitted, as none of its provisions purport *proprio vigore*, to make any such conveyance. Nothing of the kind is pretended, but the stipulation of the second article of the treaty is that the United States covenant and agree to convey to the said Indians and their descendants, by patent in fee simple, the described additional tract, meaning the tract known as the neutral lands; and the third article of the treaty stipulates that the lands ceded by the treaty, as well as those ceded by a prior treaty, shall all be included in one patent, to be executed to the Cherokee na-

---

* Minis v. United States, 15 Peters, 448; Porterfield v. Clark, 2 Howard, 76.

tion of Indians by the President, according to the provisious
of the before-mentioned act of Congress.*

Suppose that is so, still it is insisted that the President and
Senate, in concluding such a treaty, could not lawfully cove-
nant that a patent should issue to convey lands which be-
longed to the United States without the consent of Congress,
which cannot be admitted.† On the contrary, there are many
authorities where it is held that a treaty may convey to a
grantee a good title to such lands without an act of Con-
gress conferring it, and that Congress has no constitutional
power to settle or interfere with rights under treaties, except
in cases purely political.‡ Much reason exists in view of
those authorities and others which might be referred to, for
holding that the objection of the appellant is not well
founded, but it is not necessary to decide the question in
this case, as the treaty in question has been fully carried into
effect, and its provisions have been repeatedly recognized
by Congress as valid.§ Congress, on the 2d of July, 1836,
appropriated $4,500,000 for the amount stipulated to be paid
for the lands ceded by the Cherokees in the first article of
the treaty, deducting the cost of the land to be conveyed to
them west of the Mississippi under the second article of the
same treaty, which is the precise amount stipulated to be
paid for the concession, deducting the consideration which
the Indians agreed to allow for the neutral lands. Appro-
priations were also made by that act to fulfil and execute
the stipulations, covevants, and agreements contained in the

---

* Gaines *v.* Nicholson, 9 Howard, 356; Insurance Company *v.* Canter, 1
Peters, 542.

† United States *v.* Brooks, 10 Howard, 442; Meigs *v.* McClung, 9 Cranch,
11.

‡ Wilson *v.* Wall, 6 Wallace, 89; Insurance Co. *v.* Canter, 1 Peters, 542;
Doe *v.* Wilson, 23 Howard, 461; Mitchell et al. *v.* United States, 9 Peters,
749; United States *v.* Brooks et al., 10 Howard, 460; The Kansas Indians,
5 Wallace, 737; 2 Story on the Constitution, § 1508; Foster et al. *v.* Neilson,
2 Peters, 254; Crews et al. *v.* Burcham, 1 Black, 356; Worcester *v.* Georgia,
6 Peters, 562; Blair *v.* Pathkiller, 2 Yerger, 407; Harris *v.* Barnett, 4
Blackford, 369.

§ Insurance Co. *v.* Canter, 1 Peters, 511; Lawrence's Wheaton, 48.

fourth, eleventh, seventeenth, and eighteenth articles of the treaty, and for the removal of the Cherokees, and for surveying the lands set apart by treaty stipulations for the Cherokee Indians west of the Mississippi River.*    Commissioners were appointed to adjudicate the claims of individual Cherokees, as provided in the thirteenth article of the treaty, and their compensation was fixed by Congress, and appropriations were made by Congress for that purpose.    Such a board was duly constituted, consisting of two commissioners, and it was made the duty of the Attorney-General, in case of their disagreement, to decide the point in difference.†

Prior treaties between the United States and the Cherokee nation proving to be insufficient to protect and promote their respective interests, the contracting parties, on the 15th of July, 1866, made a new treaty of that date, by the first article of which they declare that the pretended treaty made with the so-called Confederate States by the Cherokee nation, on the 7th of October, 1861, is void, which is all that need be said upon the subject, as both parties repudiate the instrument and concur that it is of no effect.‡    Many new regulations are there adopted and many new stipulations made, but they are all, or nearly all, foreign to the present investigation, except the provision contained in the seventeenth article.    By that article the Cherokee nation ceded, in trust, to the United States the tract of land which was sold to the Cherokees by the United States under the provisions of the second article of the prior treaty, and also that strip of the land ceded to the nation by the fourth article of said treaty, which is included in the State where the land is situated, and the Cherokees consent that said lands may be included within the limits and under the jurisdiction of the said State, to be surveyed as the public lands

---

* 5 Stat. at Large, 73.

† 4 Opinions of the Attorneys-General, 580, 598, 613, 615–621; 10 Stat. at Large, 673, 687; 11 Id. 80.

‡ 14 Stat. at Large, 799; Ib. 326; Ib. 499.

of the United States are surveyed, under the direction of the Commissioner of the General Land Office, and that the lands shall be appraised as therein provided.

Annexed to that stipulation is a proviso that persons owning improvements and residing on the same, if of the value of $50, and it appears that they were made for agricultural purposes, may, after due proof, be entitled to buy the same at the appraised value, under the conditions therein specified. Sales of the kind may be made under such regulations as the Secretary of the Interior shall prescribe, but another proviso is annexed to the stipulation that nothing in that article shall prevent the Secretary of the Interior from selling for cash the whole of said neutral lands in a body to any responsible party for a sum not less than $800,000.

When the treaty was submitted to the Senate the last proviso was stricken out and another was adopted in its place, as follows: That nothing in the article shall prevent the Secretary of the Interior from selling the whole of said lands, not occupied by actual settlers at the date of the ratification of the treaty (not exceeding one hundred and sixty acres to each person entitled to pre-emption under the pre-emption laws of the United States), in a body, to any responsible party, for cash, for a sum not less than one dollar per acre. Exception is there made of improvements made by actual settlers, but the amendment in one respect is more comprehensive than the original treaty, as it extends the authority of the Secretary of the Interior to lands other than those known as the neutral lands, to which the original treaty was confined.

Two objections are made to the title of the appellee as affected by that treaty, in addition to those urged to show that the prior treaty between the same parties was inoperative and invalid. It is contended by the appellant that the Cherokee possessory right to the neutral lands was extinguished by the seventeenth article of the treaty, which undoubtedly is correct, but the conclusion which he attempts to deduce from that fact cannot be sustained, that the Cherokee nation abandoned the lands within the meaning of the

last condition inserted in the patent by which they acquired the same from the United States.

Strong doubts are entertained whether that condition in the patent is valid, as it was not authorized by the treaty under which it was issued. By the treaty the United States covenanted and agreed to convey the lands in fee-simple title, and it may well be held that if that condition reduces the estate conveyed to less than a fee, it is void; but it is not necessary to decide that point, as it is clear that if it is valid it is a condition subsequent, which no one but the grantor in this case can set up under any circumstances.*

Even if the rule was otherwise, still the point could not avail the appellant, as the parties manifestly waived it in this case, nor is it true that the sale in trust by the Cherokee nation to their former grantor constitutes such an abandonment of the premises as that contemplated by the condition inserted in the patent.

Unsupported in that proposition, the appellant in the next place contends that the provisions of the seventeenth article of the treaty are a mere agreement, that the article did not operate to convey the lands to the United States; but the court is entirely of a different opinion, as the proposition is contradicted by the practice of the government from its origin to the present time.†

Most of the objections urged against the prior treaty are also urged to show that this treaty is inoperative and invalid, to which the same answer is made as is given by the court in response to the antecedent objections.

Under that article of the treaty a contract was made and executed, dated August 30th, 1866, by the Secretary of the Interior, on behalf of the United States, and by the American Emigrant Company, for the sale of the so-called Cherokee neutral lands, containing eight hundred thousand acres, more or less, with the limitations and restrictions set forth

---

* 4 Kent, 127–130; Cooper *v.* Roberts, 18 Howard, 181; Kennett *v.* Plummer, 28 Missouri, 145.

† Insurance Co. *v.* Canter, 1 Peters, 542; United States *v.* Brooks, 10 Howard, 460.

in that article of the treaty as amended, on the terms and conditions therein mentioned, but the successor of the Secretary of the Interior came to the conclusion that the sale, as made by that contract, was illegal and not in conformity with the treaty and the amendments thereto, and on the 9th of October of the succeeding year he entered into a new contract on behalf of the United States with the appellee for the sale of the aforesaid lands, on the terms and conditions in said contract set forth. Embarrassment to all concerned arose from these conflicting contracts, and for the purpose of removing the same all the parties came to the conclusion that it was desirable that the Emigrant Company should assign their contract, and all their right, title, claim, and interest in and to the said neutral lands, to the appellee, and that he should assume and conform to all the obligations of the said company under their said contract. All of the parties having united in that arrangement, the United States and the Cherokee nation, on the 27th of April, 1868, adopted a supplemental article to the last-named treaty, and the same was duly ratified by the Senate and proclaimed by the President.* Acting through commissioners the contracting parties agreed that an amendment of the first contract should be made, and that said contract as modified should "be and the same is hereby, with the consent of all parties, reaffirmed and made valid;" that the second contract shall be relinquished and cancelled by the appellee, and that said first contract, as modified, and the assignment of the same, and the relinquishment of the second contract, "are hereby ratified and confirmed whenever said assignment of the first contract and the relinquishment of the second shall be entered of record in the Department of the Interior, and when" the appellee "shall have accepted said assignment and shall have entered into a contract with the Secretary of the Interior to assume and perform all the obligations of the Emigrant Company under said first-named contract, as therein modified." Important modifications were made in the first

---

* 15 Stat. at Large, 727.

contract, but it is not important that they should be reproduced at this time.\*

After the Indian title was extinguished by the treaty ceding the neutral lands to the United States, and before the supplemental treaty was concluded, many settlers, it is claimed, including the appellant, went on these lands for the purpose of settlement. They took, and have continued, possession for the purpose of complying with and procuring titles under the pre-emption laws passed by Congress, but the local land offices were not open to them, and of course they were denied the opportunity to make proof and payment. Instead of that, patents of the lands, not belonging to actual settlers, were issued to the appellee, and it is admitted by the appellant that the patent of October 31st, 1868, covers the land in controversy, and that he, the appellant, is not entitled to relief if that patent gives to the appellee a valid title.

Precisely the same objections were made to the treaty ceding back the neutral lands to the United States, and to the supplemental treaty, as were taken to the prior treaty under which the United States covenanted to convey the neutral lands to the Cherokee nation, and they must be overruled for the reasons given for overruling the objections to the prior treaty.

Acts of Congress were subsequently passed recognizing the treaty ceding back the lands to the United States, and the supplemental treaty as valid, and making appropriations to carry the same into effect.†

Some other objections of a purely technical character are made by the appellant to the title of the appellee, but these are satisfactorily answered in the printed argument filed in the case by the latter party, and are accordingly overruled.‡

Viewed in any light, the court is of the opinion that the

---

\* 16 Stat. at Large, 728.

† 15 Id. 222; 12 Id. 798; 10 Id. 283; 16 Id. 359; 5 Id. 73.

‡ Attorney-General *v.* Deerfield Bridge Co., 105 Massachusetts, 9.

title to the land in controversy is in the appellee, and that there is no error in the record.

DECREE AFFIRMED IN EACH CASE.

NOTE.

WARNER *v.* JOY.

No. 327.

THE decree in this case (like the preceding one, an appeal from the District of Kansas) was also affirmed; Mr. Justice CLIFFORD (who delivered the judgment of the court) observing, that it was clear that such a decree must be given, on an application of the principles adopted and the reasons given in the case just decided; as the pleadings were substantially the same as in it, and there was a stipulation of the parties that the court might take and determine the demurrer filed upon the agreements made in that case and without further argument.

So, too, judgment was here affirmed on a writ of error (No. 328) to the same district, in a suit of ejectment by Joy against Warner for these same lands, where judgment had been given in favor of Joy; Mr. Justice CLIFFORD, who delivered the judgment of the court, saying that the questions presented for decision were "in all respects the same as those presented and decided in *Holden* v. *Joy;*" and that "the court, without hesitation, decides that the title of the plaintiff is complete, and that he is entitled to judgment for the recovery of the possession of the premises in controversy."