THE TUSCARORA NATION OF INDIANS, Respondent, *v.* DANIEL WILLIAMS, Impleaded, Appellant.

(County Court, Niagara County, February, 1913.)

Statutes — construction of — intention made manifest by express worus.
Indians — Tuscarora reservation — cutting second growth timber on lands of — Indian Law, § 97.

> A statute will not be construed to operate retrospectively so as to take away a vested right unless that intention is made manifest by express words.

> Where lands, a part of the Tuscarora Indian reservation, had been occupied and cleared by the ancestors of the present Indian owner prior to the enactment of chapter 175 of the Laws of 1854, now revised as sections 95–99 of the Indian Law, and another member of the tribe openly cut second growth timber on said lands under a claim of right with the knowledge and consent of the owner to whom a consideration was paid for the privilege, defendant is not subject to the provision of section 97 of the Indian Law.

APPEAL from a judgment rendered in favor of plaintiff in an action to recover a penalty for cutting timber on the Indian lands.

Glenn A. Stockwell, for respondent.

William E. Lockner, for appellant.

HICKEY, J.  In this action plaintiff, a tribe of Indians located in Niagara county, seeks to recover a penalty from defendant, a member of the tribe, for the cutting of certain

timber upon land of one Avis Doxstater, another member of the tribe. The timber was cut openly under a claim of right with the knowledge and consent of the owner to whom a consideration was paid for the privilege. The Avis Doxstater farm, so called, is a part of the Indian reservation. The Tuscaroras are considered the most civilized of all the Indians of the state. Many members of the tribe are well to do and occupy and cultivate extensive farms. The individual members lease their lands to each other and to white men. They also transfer their lands among themselves and devise the same by last wills and testaments. These wills are admitted to probate in the Surrogate's Court of the county and are recognized as valid both on and off the reservation.

My attention has been called to no statute prior to the year 1854 dealing with the lands or timber rights of these Indians, but in that year, by chapter 175, the subject received legislative consideration.

The substance of the act then passed is now found in revised form in sections 95, 96, 97, 98 and 99 of the Indian Law, volume 2, Cummings and Gilberts Consolidated Laws, 2422.

The first three sections of this law, which seem to be the only ones necessary to quote, are as follows:

" Sec. 95. Allotment of lands.— The chiefs or head men of the Tuscarora nation of Indians in the county of Niagara, in council, shall allot and set apart for any Indian or Indian family, making application and not possessing land, so much of the tribal lands as they shall deem reasonable and just; and no tribal lands shall be appropriated by any Indian to his own use, without such consent and allotment. Such chiefs, in council, may appoint a clerk, who shall enter in a book kept for that purpose every allotment of tribal lands, set apart for any Indian or Indian family, and of the part thereof from which such Indian or Indian family may sell timber and trees, and of the part he is permitted to clear for the purposes of cultivation.

" Sec. 96. Consent of chiefs to sales of timber.— Any Indian having tribal lands allotted to him by the chiefs,

with the consent of such chiefs entered in the clerk's book, may sell for his own benefit any timber or trees on that portion of such lands which he shall actually and in good faith clear for the purposes of cultivation.

"Sec. 97. Indian trespassers.— Any Indian who shall cut or destroy timber or trees on any of the timbered lands of such nation, or without the consent of such chiefs, shall be liable to a penalty of twice the value of the timber so cut down or destroyed, recoverable by such chiefs, in the name of the nation."

Referring to the act of 1854, which in substance is the same as the sections above quoted, it will be observed that it recognizes the fact that portions of the reservation had already come under cultivation and were in the possession of certain individual Indians and by implication it exempts such lands from further allotment. The expression "tribal lands," as used in the act of 1854 and in sections 95 and 96 above, clearly and unmistakably refers to that portion of the reservation not already occupied by individual Indians and which may be referred to as the unallotted or common lands of the nation. This same expression "tribal lands" occurs also in section 98 and must be given the same meaning that attaches to it where it appears in sections 95 and 96. Section 98 has not been quoted because of its length and for the reason that it appears to me to refer exclusively to the tribal or common lands of the nation and not to those lands which had been allotted or which were otherwise lawfully acquired by individual members of the tribe. The last sentence of this section gives a right of action to the chiefs for the sale or removal of any timber from the lands of the nation. It runs as follows: "Any person who shall sell, take or carry from the lands of such nation any trees, lumber, or articles manufactured therefrom, without the consent of such chiefs, in any other case *than is provided for in this section,* shall be liable to a penalty of twice the value of such trees, timber or manufactured articles, recoverable by such chiefs."

The language of this sentence is so general that upon a first reading the inference might be drawn that it included

all lands whether allotted or not.  It implies that with the consent of the chiefs, as provided in the section, trees might be cut and carried away, but by implication it also prohibits their being cut or carried away even with the consent of the chiefs in any other case than as in that particular section provided.  To give it this construction brings it in direct conflict with the provisions of section 96 preceding it.  But by construing it as having reference only to the common or tribal lands to which the earlier portion of the section refers, full effect can be given to the language employed and no conflict with the provisions of section 96 will result.  The action, therefore, must be regarded as having been brought pursuant to the provisions of section 97 as quoted above.

It will be noted that this is a penal statute and as such must be construed strictly in favor of the person against whom it is invoked.  It would be superfluous to cite authorities in support of this proposition.

It is conceded that the lands from which defendant admits he cut the timber were not allotted pursuant to the provisions of the act of 1854 or of any revision or amendment thereof, but were occupied and cleared by the ancestors of the present owner before the act of 1854 was placed upon the statute books.  It also appears and is not disputed that the timber, for the cutting of which complaint is made, was a second growth, some of which appears to have been growing for many years.

In view of the uninterrupted and undisputed possession by the present owner and her ancestors of the premises in question from some point of time not definitely fixed but antedating the act of 1854, it must be presumed that the original occupancy was legal and in accord with the Indian laws or customs of the period and gave to the occupant a full Indian title.  Jemison v. Bell Telephone Co., 186 N. Y. 493.  And, from the fact that the timber then growing upon the premises was cleared off, it must be presumed that the original occupancy carried with it the right to remove such timber; and that such timber was so cut off and removed before the act of 1854 is the only inference to be drawn from the evidence.

Was the act of 1854 then intended to apply to lands theretofore acquired and cleared by individual Indians pursuant to some Indian Law or custom in vogue at the time, or was it intended simply to apply to lands thereafter to be allotted and to the unallotted or common lands of the nation?

If the original owner of this land possessed the right to remove the timber therefrom, which must be assumed, and exercised that right, the question arises whether there is anything in the provisions of the act of 1854 or any subsequent revision thereof which so clearly takes that right away as to subject the owner or her assignee to a penalty for clearing off a second growth of timber which had been allowed to flourish upon a small part of the original clearing. To so hold would be construing a somewhat doubtful statute against, instead of in favor of, the person accused of its violation. Moreover, it seems to me that such a construction would be giving the statute a retroactive effect. Assuming that the original occupant possessed the right to clear the land, such privilege was in the nature of a vested right. And a statute is not to be construed to operate retrospectively so as to take away a vested right unless that intention is made manifest by express words. Sayre v. Wisner, 8 Wend. 661; Dash v. Van Kleeck, 7 Johns. 477.

Authorities without number to the same effect might easily be cited.

Suppose that the land in question had been allotted to the ancestors of the present owner pursuant to the provisions of an earlier statute which permitted the removal of all timber therefrom, can it be seriously urged that there is anything in the statute of 1854 or its later revisions that expressly or by necessary implication takes away such right? If not, then it was not taken away by the statutes referred to; for whether the original occupant acquired his right to remove the timber by virtue of a statute or pursuant to some ancient Indian law can matter little, as the principle involved is the same and should be equally respected.

It will be noted that the penalty sought to be recovered

is for the cutting or destruction of trees " on any of the timbered lands of such nation." What is meant by the expression " timbered lands of such nation ? " Does it mean certain unallotted lands of the tribe of which there are in the neighborhood of a thousand acres still on the reservation, or does it mean not only such lands but the allotted lands as well ? If it means the latter then the use of the word " timbered " is superfluous and mischievous because it is misleading and leaves one in doubt as to the meaning of the expression. If the construction for which plaintiff contends is to prevail then the cutting of a shade tree which had become objectionable without the consent of the chiefs would be a violation of the statute. So would be the cutting down of any small clump of second growth trees from the premises. And where is the line to be drawn between shrubbery and timber ? To what size must a second growth attain before it comes within the meaning of the expression " timbered lands of such nation ? "

While it might be possible to hold that lands allotted subsequently to the act of 1854, on which timber was standing at the time and in respect to which restrictions as to cutting were imposed by the chiefs at the time of such allotment, were embraced within the meaning of the expression " timbered lands of such nation," it seems to me that it would be straining a penal statute beyond all reasonable limits to hold that the expression quoted also included second growth trees upon lands acquired by allotment or otherwise without restrictions as to cutting previous to the enactment of said statute or any other statute upon the subject. As trees could not very well be cut or removed from cultivated lands where there were none, it may well be argued that the expression " timbered lands of such nation " was intended as a synonymous expression for " tribal lands " and was used to distinguish the lands held in common from the allotted lands which for all practical purposes have ceased to be " lands of such nation."

In any event, the statute is penal and the expression " timbered lands of such nation " is too vague to justify a holding that it includes second growth trees not growing

upon the common lands of the nation or upon lands allotted since the enactment of the statute of 1854, but upon lands which came into the possession of the ancestors of the present owner and were cleared and cultivated by them long before the state of New York ever thought of regulating by legislation the affairs of the Tuscarora Nation of Indians.

Suppose that prior to 1854 the state of New York had by statute authorized the sale of some of its own public lands; and suppose such lands were sold without restriction as to the cutting of timber and that some of the purchasers had entirely denuded their purchase of any timber growing thereon; and suppose further that thereafter and in 1854 the state enacted another statute in all respects like this Indian Law, conferring upon town boards the same power in respect to timber that this Indian Law confers upon the chiefs, could it be seriously urged that a purchaser under the first act on a part of whose land a second growth had been allowed to spring up and who, after it had to some extent matured, cleared it off again, had thereby violated the second act and subjected himself to the penalty which it prescribes? It does not seem to me that the act of 1854 or its later revisions would receive such a construction in its application to a citizen of the state. And there would seem to be little difference between the supposed case and the actual case. True, the Indian Nation retains a nominal title to all the lands of the reservation; but for all practical purposes the individual Indian who acquired the land and cleared it before the act of 1854 and who through his heirs has held undisputed and uninterrupted possession ever since is the owner, and no good reason appears to me why he or his heirs or their assigns should be penalized at this late day for cutting off a second growth upon a portion of the premises.

Nor can it be fairly claimed that the Indians have given a practical construction to these statutes in accordance with plaintiff's contention. Only two instances were proved upon the trial where the chiefs were applied to and gave their consent to the cutting of trees upon allotted lands, not to mention lands acquired previous to the statute of 1854.

On the other hand, evidence tending to show that it was customary for the Indians to cut trees on their allotments without the consent of the chiefs was excluded. In short, the authority of the chiefs to sue for the cutting of trees upon lands allotted since the act of 1854 seems never to have been conceded, and so far as appears any effort made by them to enforce such authority has not been successful.

But whatever their authority may be in respect to lands allotted since the act of 1854 (which, however, is not here involved), the question now before the court is, what is their authority in respect to second growth timber on lands allotted or acquired before that date when there was no statute law at all upon the subject, and are they entitled to recover a penalty for the cutting of such second growth without their consent? My judgment is that they are not.

The tendency of the higher courts at the present time in dealing with Indians seems to be to treat them and their rights in respect to their property the same so far as possible as white men are treated and this decision is calculated to follow that tendency. Peters v. Tallchief, 121 App. Div. 309; Matter of Printup, Id. 322.

It follows that the judgment below must be reversed, with costs.

Judgment reversed, with costs.