QUESTIONS: 1. Did the State of Florida, on April 5, 1960, or thereafter, take a final action effectively to grant Seminole or Miccosukee Indians any legal rights to use and occupy certain lands in Dade and Broward Counties? 2. What is the extent of any legal rights granted by the state to the Seminole or Miccosukee Indians? 3. What effect does the legislation establishing the Everglades Recreational Planning Board and the recreational program to be implemented thereunder have upon any legal rights granted to the Indians on April 5, 1960?
SUMMARY: On April 5, 1960, the Governor and Cabinet approved a proposal to give Seminole Indians permission to use certain state land contiguous to the Miccosukee Reservation. The legal foundations of the license are uncertain, but the moral promise is clear and should be seriously considered when appropriate agencies establish a more definitive policy for this state land. The attempted license would grant to the Indians a revocable privilege to use the specified lands to hunt, fish, frog, and use, occupy, and enjoy the area as tribal lands, subject to several limitations, including public hunting and fishing. Any diminution of the license should be preceded by a public hearing. Section 372.025, F.S., creating the Everglades Recreational Planning Board, may operate as a partial revocation of the attempted license to the extent of conflicts, but the statute also contains the implication that recreational development of the area should be harmonized with Indian interests. During the years 1959 through 1960, the Governor and the Cabinet, sitting as the Board of Commissioners of State Institutions, met on several occasions to consider matters relating to Florida Indians. Colonel Max Denton at that time was Commissioner of Seminole Indian Affairs and the Board of Commissioners of State Institutions was trustee of Seminole Indian Reservation land (s. 285.02, F.S. 1959). Meetings were held with the Board of Commissioners of State Institutions on August 11, 1959, and November 17, 1959, to discuss in particular a proposal to commit certain state lands to Indian use. Negotiations with the Seminole Indians, with Commissioner Denton, and with the Federal Bureau of Indian Affairs continued through the spring of 1960 and culminated with the approval of "a commitment of state land for use and benefit of Seminole Indians of Florida" by the Board of Commissioners of State Institutions on April 5, 1960. AS TO QUESTION 1: On April 5, 1960, Commissioner Denton's proposal entitled a "commitment of state land for use and benefit of Seminole Indians of Florida" was approved and adopted by the Board of Commissioners of State Institutions. See Minute Book 2, p. 233, April 5, 1960 (Minutes of the Board of Commissioners of State Institutions). The land, by legal description, is contiguous to and east of the existing Miccosukee Reservation and is located in Dade and Broward Counties. The next day, April 6, 1960, Commissioner Denton wrote various Indian groups advising them that the Board of Commissioners of State Institutions had "approved a proposal to set aside 143,620 acres of additional land in Broward and Dade Counties for the use and benefit of the Seminole Indians of Florida." Commissioner Denton further advised the Indians they were now "authorized to work up a plan . . . to start any development of any portion of this area," subject to the approval of the board. On April 7, 1960, Commissioner Denton wrote a number of letters to various newspapers and private citizens wherein he stated that a proposal "to set aside 143,620 acres of land for the use and benefit of the Seminole Indians of Florida" was "approved by the Cabinet." He stated in the letter: It is our further belief that by this action we have stated to the Indian people that it is now up to them to take advantage of the opportunity offered. If they refuse to make use of the land or develop it, the land will still be held for them to hunt, fish, frog, hold ceremonials, etc. One of my predecessors, Attorney General Richard W. Ervin, also prepared a form letter with regard to the matter which acknowledged that the Cabinet "took action" granting the Indians certain privileges on approximately 143,000 acres of land. On August 31, 1960, in a letter to Fred A. Seaton, Secretary of the Interior, Governor Collins also referred to the commitment of state land as an accomplished fact. The minutes of the meeting of April 5, 1960, provide further evidence that a final completed action was taken. The minutes reflect that the Board of Commissioners of State Institutions intended by its action to "place into effect a definite arrangement." Governor Collins commented that the action was "taken as a manifestation of intent and desire that the Indians will have the use and benefit of the lands, which are being made available to them." Id. From the foregoing it is abundantly apparent that the Governor and the Cabinet, acting as the Board of Commissioners of State Institutions, believed that they had taken a final action to commit certain lands for the use of Indians. This conclusion is further buttressed by the fact that the chief administrative official responsible for Indian matters, Commissioner Denton, transmitted the approved proposal to the Indians as fait accompli. In 1960, several state agencies had statutory authority to manage and determine the use of state land. Pursuant to s. 229.08(6), F.S. 1959, the State Board of Education had responsibility and authority to "fix the . . . policies relating to rental or use of" lands "held by the state for educational purposes," and "to adopt whatever policies may be necessary to preserve them from trespass. . . ." Within the area of the license, every sixteenth section was "land held by the state for educational purposes" and was therefore subject to disposition by the State Board of Education pursuant to s. 229.08(6). All other state-owned land in the license area was subject to the "administration, management, control, supervision, conservation and protection" of the Trustees of the Internal Improvement Trust Fund. Section 253.03, F.S. 1959. Although these agencies had general authority to determine the use of state lands under their respective jurisdictions, only the Board of Commissioners of State Institutions had authority to devote state lands to the use and occupancy of Seminole Indians. In 1960, s. 285.14(2) and (4), F.S., provided:
(2) The board of Commissioners of state institutions, as trustee, may acquire lands in the name of the state and devote the same to the exclusive use, occupancy and benefit of said Indians for the purpose of promoting the health, general welfare, safety and best interest of said Indians. (4) The trustees of the internal improvement fund, the state board of education of Florida and any other state board or agency having title to lands or having lands under their jurisdiction, management or control may in the discretion of said board, convey and transfer to the board of commissioners of state institutions the title to any of said lands in trust for the use and benefit of said Indians. (Emphasis supplied.) A literal reading of these provisions would result in the conclusion that the Board of Commissioners of State Institutions only had authority to devote to Indian use those lands which the board had "acquired" or the title to which had been conveyed to the board by the Trustees of the Internal Improvement Fund or the State Board of Education. Since none of the lands in question were acquired by the board, nor was title transferred to the board, it could be concluded that the Board of Commissioners of State Institutions had no authority to create a license on April 5, 1960, unless and until it actually held title or "acquired" the land. Yet, as the evidence which is set forth in detail above demonstrates, the members of the Board of Commissioners of State Institutions and the administrative official in charge of Indian matters in 1960 had no doubts at that time that they had taken a final and effective action to grant a revocable license as described in the minutes of April 5, 1960. Ordinarily, the contemporaneous administrative interpretation of a statute is entitled to great weight, and it has been my normal practice to defer to the interpretation that is placed upon a statute by the administrative agency concerned, in the absence of judicial guidance to the contrary. In this case, nearly 15 years have elapsed since the Board of Commissioners of State Institutions approved the proposal of the Commissioner of Indian Affairs and it would be inappropriate for me at this time to state categorically that the board lacked statutory authority in 1960 in the face of evidence that the board must have interpreted the statute to authorize the action taken. There is, indeed, a reasonable legal rationale which could have been the basis for the board to conclude that s. 285.14(2), F.S. 1959, authorized the board to take the action taken on April 5, 1960. Since the Legislature expressly authorized the Board of Commissioners of State Institutions to acquire state lands and devote them to Indian use and occupancy, it could be inferred that the Board of Commissioners of State Institutions had authority to devote existing state lands to Indian use and occupancy. "Authority that is indispensable or useful to the valid purposes of a remedial law may be inferred or implied from authority expressly given." State ex rel. Railroad Com'rs v. Atlantic Coast Line, 54 So. 395 (Fla. 1911). Sections 285.07 through 285.13, F.S. 1959, are clearly remedial in purpose. Section 285.07, F.S. 1959, states that:285.07 Purpose of law. — That the purpose of ss. 285.07-285.13 is to protect the Seminole Indians of Florida against undue and unnecessary hardships during these difficult years of transition from their ancestral culture to the culture of the white man's civilization and to aid said Indians to obtain economic independence as a tribe and as individuals.
Section 285.14, F.S. 1959, which authorized the Board of Commissioners of State Institutions to devote state land to Indian use and occupancy, surely partakes of the same remedial purpose as expressed by the Legislature in s. 285.07. The land commitment is not a model of clarity, primarily because it is in proposal form, its verbs are in future tense, and it was never reworded as a final action. The minutes tell us only that the Board of Commissioners of State Institutions approved all of the recommendations contained therein. The most troublesome interpretive aspect is Paragraph D, which reads: D. Trusteeship for use and benefit of Seminole Indians: Commitments to be made by revocable license jointly by Trustees of the Internal Improvement Fund, State Board of Education and Central and Southern Florida Flood Control District, as owners of the land to and with the Board of Commissioners of State Institutions as trustees for the Seminole Indians residing in Florida. The instrument shall become effective in all its provisions upon execution by the four Boards. (Emphasis supplied.) Two interpretations of this paragraph are possible: The word "commitments" may mean all commitments of the land, including the year-round license for hunting, fishing, and use as tribal lands contained in Paragraph E4 of the license. A second interpretation is also possible. "Commitments" may mean only future economic development of the land, such as recreational concessions, which might entail permanent improvements and long-term leases from the state to aid the economic status of the Indian. If Paragraph D is given the first interpretation, it would appear that the license was never executed because there is no record that the Trustees of the Internal Improvement Fund, State Board of Education, or the Central and Southern Florida Flood Control District ever considered the matter. As a result, following the first construction of Paragraph D, the Indians were not given an effective license to hunt, fish, and use the area as tribal lands. As noted previously, these various boards had statutory authority to determine use of the land, so it was logical that there be some provision in the proposal that these additional approvals be obtained, at least insofar as substantial and perhaps irrevocable commitments of the land were to be made. Ultimately, the proper interpretation can only be supplied by judicial decision. Wholly aside from the legal issue, I feel that the State of Florida should now, in 1975, completely reassess its policies in this matter and reduce such policies to more precise written documents. Therefore, there may be no need for judicial determination of the issue. There is strong evidence, however, perhaps a preponderance of the evidence, that the second interpretation is more appropriate. There is much evidence that the proposal for commitment of state lands contained two distinct stages. The first stage was an immediate license to hunt and fish on the land and to use and occupy the land as tribal lands contained in Paragraph E4. Subsequently, the Indians had permission to make permanent improvements on the land to improve their economic condition. Specific projects, however, required more formal approval. The Attorney General in 1960, Richard W. Ervin, recognized this distinction. In his form letter explaining the action he noted that at a later date the Indians might submit plans to the Cabinet for specific development of the land. Commissioner Denton made the same distinction in the first paragraph of his letter of April 6, 1960, transmitting the approved commitment to the Indians. He noted that the setting aside of 143,000 acres for the use and benefit of the Indians had been approved. In the third paragraph he pointed out that the Indians were now authorized to work up a plan for development of any portion of this area, but the plan would have to be submitted to the board for approval prior to starting the work. This two-stage approach was contemplated by Commissioner Denton in a memorandum dated March 16, 1960, transmitting the proposed commitment of state lands to the Governor and Cabinet. In that memorandum Commissioner Denton stated that the proposal would put the State in a definite position as to what it will or will not do. This can then be explained to the Indians as a positive action taken, outlining to them how they can proceed to take advantage of the offer made in their behalf. If they do not accept the use of these lands as proposed, it will still be assured to them for hunting, fishing, etc., also allowing non-Indians to hunt and fish under rules established by the Fresh Water Fish and Game Commission. It is significant that Commissioner Denton understood that approval of the proposed commitment of land would have the immediate result of granting hunting and fishing privileges to the Indians even though the Indians subsequently did not submit plans for economic development of the land. As previously noted, the minutes reflect that the purpose of the action on April 5, 1960, was to "place into effect a definite arrangement." Minute Book 2, p. 235, April 5, 1960. Implicit in this statement is the thought that the action of April 5, 1960, created an "arrangement" or a set of mutual rights and responsibilities between the state and the Indians that was "definite" and would begin immediately but would also govern relations in a definitive way in the future. An immediate license to use and occupy the land coupled with a procedure whereby approval could be attained for permanent improvements to facilitate economic advancement is the kind of "definite arrangement" that seems to have been "placed into effect." In other words, Paragraph E4 of the approved proposal granting a license to hunt, fish, and use and occupy the land as tribal lands became immediately effective, but commitments of the land for economic development by contract, lease, or otherwise, would require prior approval of the Board of Commissioners of State Institutions pursuant to Paragraph E9 and such commitments were to be made by a revocable license jointly with the trustees, the State Board of Education, Central and Southern Florida Flood Control District, and the Board of Commissioners of State Institutions to be effective pursuant to Paragraph D. Indeed, even though Paragraph D speaks of "commitments" to be made with the joint approval of the four boards, it could be argued that all approvals were given to the immediate grant of a privilege to hunt, fish, and occupy the land as tribal lands in accordance with Paragraph E4, although not evidenced in available records. In 1960 the Governor and four members of the Cabinet (Commissioner of Agriculture, Attorney General, Comptroller, and State Treasurer) were the Trustees of the Internal Improvement Fund. Section253.02, F.S. 1959. The Governor and four members of the Cabinet (Attorney General, Secretary of State, State Treasurer, and Superintendent of Public Instruction) were the State Board of Education, s. 229.15, F.S. 1959. Would the Governor and the members of the Cabinet disapprove an action taken by them wearing another hat? Disapproval was unlikely, and I have found no evidence of disapproval by either the State Board of Education or the Trustees of the Internal Improvement Fund. Moreover, I have found no evidence of disapproval by the Central and Southern Florida Flood Control District. Strictly speaking, the Central and Southern Florida Flood Control District is not an "owner" of the land in question, but has certain flowage easements. Paragraph E2 of the license completely protects all interests that the Central and Southern Florida Flood Control District may have, so "approval" by that agency would have little effect. If the Commissioner of Seminole Indian Affairs and the Attorney General were satisfied that final action to commit the land had been taken, in the absence of evidence to the contrary it may be concluded that approvals needed were obtained. It is a settled rule that acts of administrative officials are presumed valid and in good faith in the absence of evidence to the contrary. Varholy v. Sweat, 15 So.2d 267 (Fla. 1943); Glendinning v. Curry,14 So.2d 794 (Fla. 1943); McConvile v. Ft. Pierce Bank Trust Co.,135 So. 392 (Fla. 1931). In determining whether, on April 5, 1960, the Governor and Cabinet took final action on the land commitment proposal, it is also particularly important to note that no interest in real estate was involved, but only a license permitting certain activities on the land. Paragraph E7 of the license states: "The commitment of said area shall not operate as a conveyance of title but only as a right to use and occupy." Furthermore, in the November 17, 1959, meeting of the Board of Commissioners of State Institutions, Governor Collins made it clear that the board had no legal authority to convey the land or set up an irrevocable trust, but had authority to control the use of land and might grant a license for the benefit of the Indians. See p. 9, transcript of the meeting of Board of Commissioners of State Institutions, November 17, 1959. A license in real estate is not an interest in real estate, but is a mere permission to enter the land for a specific purpose. Jenkins v. Lykes, 19 Fla. 148
(1882). As a general rule, there are no specific formalities necessary for the creation of a license, and a license may be completely oral and still be effective. Fowler v. Ramsey,71 So. 747 (Fla. 1913); Burdine v. Sewell, 109 So. 648, 655 (Fla. 1926); Jenkins v. Lykes, 19 Fla. 148 (1882). A license may be implied from the circumstances. St. Petersburg Coca-Cola Bottling Co. v. Cuccinello, 44 So.2d 670, 676 (Fla. 1950). It is not necessary for a licensee formally to accept a license, and it is sufficient for the legal effectiveness of the license that the licensee merely act in reliance thereon. Seaboard Airline Railway Company v. Dorsey, 149 So. 759 (Fla. 1932). Since the law does not require specific formalities for the creation of a license and will imply a license from the facts, the circumstances described above and the actions of the Governor and Cabinet and Commissioner Denton are strong evidence that on April 5, 1960, a legally effective license to use and occupy certain state lands was granted to the Seminole Indians. It would appear that there is more evidence that a license was created than evidence that no license was created. It must be rather apparent from the foregoing that the license of April 5, 1960, rests upon uncertain legal foundations. It is, however, abundantly apparent that the Governor and Cabinet intended to establish a license as outlined in the minutes of April 5, 1960. Although the legal obligation is indistinct, the moral promise is clear. For this reason, and also because circumstances have changed in the 15 years since the Governor and Cabinet last considered this matter, I recommend that appropriate agencies reopen and establish a clear and precise state policy, taking into serious consideration the details of the license of 1960. The answers to questions 2 and 3 are thus provided to assist appropriate agencies in the process of precisely establishing a new state policy. For the purposes of questions 2 and 3, a license is assumed to exist. AS TO QUESTION 2: The license was to be granted to "Seminole Indians residing in Florida." The words "Seminole Indians" are defined in the license to "include persons of Seminole Indian blood as defined and approved by the Tribal Council of the Seminole Tribe of Florida." The phrase "Seminole Indians residing in Florida" is used again in Paragraphs D, E4, and E8 of the license. A question has arisen whether the license was granted to the Seminole Indians or to the Miccosukee Tribe of Seminole Indians in particular. In 1960 by statute the word "tribe" was defined for purposes of ss. 285.09-285.13, F.S. 1959, as "the Seminole tribe in the State composed of bands of Indians known and referred to as Miccosukee and Muscogee or Cow Creek." Section 285.08(1). The transcript of the meeting of the Board of Commissioners of State Institutions on November 17, 1959, reflects that two distinct Indian groups, the organized Seminole tribe and the Miccosukees, were present. No firm decisions were made at the meeting of November 17, 1959, but the Governor favored taking action for all Florida Indians and not just a particular group. See pp. 15, 16, and 18 of the transcript. The Miccosukee group sought control of the land to be set aside. (See the letter received by Governor Collins on February 1, 1960, from Commissioner Glen Emmons, U.S. Department of Interior, Bureau of Indian Affairs.) On February 25, 1960, Commissioner Denton prepared an informal memo summarizing to that date the negotiations and decisions regarding the commitment of lands for Indian use. Attached to his memo are excerpts from minutes of the Board of Commissioners of State Institutions. Of particular interest is a meeting on January 26, 1960. At that meeting, Governor Collins reported he had talked with three members of the Cabinet committee on Indian Problems who were of the opinion that the state should not undertake any specific arrangement with "any special organization of Indians" but should make available land to "all Indians regardless of tribe" and allow the federal government and the Indians discretion as to administration. Governor Collins endorsed this approach, and reasoned that "if the State deals with all Indians and does not draw lines, it will hasten the day when they will all be working together as one people." The license therefore runs to all "Seminole Indians residing in Florida" and not to any one Indian group. The stated purpose of the action of the Governor and Cabinet in 1960 was "to foster, assure and conserve to the Seminole Indians of Florida their native religion, customs, traditions and economy in their native habitat." Paragraph A. The Governor further elaborated that "while the board is limited in power to make an irrevokable [sic] agreement, this action is taken as a manifestation of intent and desire that the Indians will have the use and benefit of the lands, which are being made available to them." The heart of the license is set forth in Paragraph E4: A year-round license privilege to Seminole Indians residing in Florida to (a) hunt and fish, (b) take frogs for consumption as food or for sale, (c) take and use native materials for tribal uses, fabrication into artifacts, utensils, handicrafts and/or souvenirs for sale, (d) use, occupy and enjoy the committed areas as tribal lands, consistent with all limitations set forth, not in conflict with laws of the United States and the State of Florida. Certain areas may be established as agricultural areas, and removed from public hunting and fishing area, as approved. The most important portion of Paragraph E4 is subparagraph (d) which grants a year-round license to: Use, occupy and enjoy the committed areas as tribal lands, consistent with all limitations set forth, not in conflict with law of the United States and the State of Florida. The proper definition of the words "tribal lands" thus becomes critical to the scope of the license. The aboriginal possessory interest of an Indian tribe to use and occupy land, or "Indian title," has a long established legal definition. In Mitchel v. United States, 34 U.S. 711 (1835), the United States Supreme Court expounded on the nature of Indian title under British law when Florida Indians were under British rule. The court noted that the United States recognized the same legal principles: . . . friendly Indians were protected in the possession of the lands they occupied, and were considered as owning them, by tribe or nation inhabiting them, as their common property, from generation to generation, not as the right of the individuals located on particular spots. Subject to his right of possession, the ultimate fee was in the crown and its grantees which could be granted by the crown or colonial legislatures while the lands remained in the possession of the Indians, though possession could not be taken, without their consent. * * * * * Indian possession or occupation was considered with reference to their habits and modes of ife [sic]; their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their right to its exclusive enjoyment in their own way, and for their own purposes, were as much respected, until they abandoned them, made cession to the government, or an authorized sale to individuals. [Mitchel v. U.S., 34 U.S. 711,745-46 (1835). Accord: Holden v. Joy, 84 U.S. 211, 243-44 (1872).] The Indian right to use and occupy the land under British and colonial rule and under treaties was a possessory right and, like a leasehold, was not incompatible with a fee title remaining in the crown. Also like a leasehold, the Indian right to use and occupy the land was sufficient to maintain an action of ejectment against trespassers. Marsh v. Brooks, 8 How. (U.S.) 223, 232 (1850); Johnson v. McIntosh, 8 Wheat. (U.S.) 543, 592 (1923). It is apparent, however, that the license created on April 5, 1960, was not intended to grant aboriginal tribal rights. The license is revocable "in the best interest of the State" (Paragraph E8), does not convey "title," but only a "right to use and occupy" (Paragraph E7), and the license is expressly "not intended to admit any obligations on the part of the State of Florida to any claims made by the Indians, but is solely an effort to improve the welfare and economy of the Indian people." Page 3, Minute Book 2, April 5, 1960, meeting of the Board of Commissioners of State Institutions. Yet the words to "use, occupy and enjoy the committed areas as tribal lands" were deliberately used and must have some particular meaning with reference to Indian law and custom. It would be appropriate to apply the rules of interpreting treaties in the interpretation of the license document. The license is not a treaty, of course, but the meetings and negotiations that preceded the April 5, 1960, action were not unlike the circumstances surrounding the making of a treaty. The Indian groups involved in 1960 were economically and educationally unequal to the representatives of the State and less able to participate effectively in drafting the license. With regard to treaties, the United States Supreme Court has stated that it is the settled policy of the United States to deal fairly with Indian tribes. Treaties are "not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them." United States v. Shoshone Tribe, 304 U.S. 111, 116 (1938). A cardinal rule in interpretation of a document is that words and phrases be given "the natural meaning or that meaning most commonly understood when considered in reference to subject matter and circumstances." Rupp Hotel Operating Co. v. Donn, 29 So.2d 441 (Fla. 1947). Words having a definite legal meaning that are intentionally used should be given the definite legal meaning. Langley v. Owens, 42 So. 457
(Fla. 1906). "Tribal lands" usually mean those lands within the boundaries of an Indian reservation held in trust by the federal government for the Indian tribe as a community. Somday v. Rhay,406 P.2d 931, 934, (Wash. 1965); Tuscarora Nation of Indians v. Williams, 141 N.Y.S. 207, 209 (N.Y. 1913). It is reasonable to conclude therefore that the Indians in 1960 would have understood that tribal lands meant something similar to those lands already held in trust as formal reservations. In the absence of more specific facts concerning the use of the committed lands, it is not possible or appropriate at this time for me to speculate as to the full extent of the meaning of the words to "use, occupy and enjoy the committed areas as tribal lands." It is my opinion that these words were used to give Seminole Indians the privilege of using and occupying the committed lands in a way similar to, but not as extensive as, land was used and occupied under aboriginal Indian "title." It appears that the Governor and Cabinet on April 5, 1960, intended to establish a limited, informal, and revocable Indian reservation on the committed lands, and to grant the Indians a privilege to use and occupy the land as tribal lands as these words generally were understood in colonial times, under treaties, and with regard to more formal Indian reservations. As a corollary and to the extent of legitimate tribal use, the Indians gained the right until properly revoked to exclude other uses of the land not sanctioned by the license agreement and inconsistent with tribal use. Though something in the nature of aboriginal Indian use and occupancy was intended, the Governor and Cabinet clearly did not intend to grant a use privilege as extensive as aboriginal Indian title. As mentioned previously, the license was expressly not granted in response to Indian claims. The license contains several significant limitations, and in particular: 1. The license may be revoked at any time upon a finding that revocation is in the "best interest of the State." Paragraph E8. 2. Specific commitments of the land by contract or lease (presumably economic enterprise) must first be approved by the Governor and Cabinet. Paragraph E9. 3. Business enterprise on the committed area remains subject to state regulation. Paragraph E6. 4. The state reserves all mineral rights. Paragraph E3. 5. All rights in the committed areas enjoyed by the Central and Southern Florida Flood Control District are preserved. Paragraph E2. 6. Use and occupation as tribal lands is expressly subject to the limitations contained in the license document and cannot be in conflict with the laws of the United States and the State of Florida. Paragraph E4. 7. Public hunting and fishing may continue in the area. Paragraphs E4 and E5. Two of the above-enumerated limitations require comment. The license may be revoked at any time "in the best interests of the State." Certain procedures should be followed, however, should partial or total revocation be contemplated. Since important legal interests may be involved, it would be prudent that modification or revocation of the license occur only after a full public hearing at which all parties in interest might have notice and an opportunity to be heard. Cf. Fuentes v. Shevin, 407 U.S. 67, (1972); North Georgia Finishing, Inc. v. Di-Chem, 43 U.S.L.W. 4192 (January 22, 1975); but cf. Mitchell v. W. T. Grant Company, 42 U.S.L.W. 4671 (May 13, 1974). It would also be prudent that modification or revocation be premised upon specific findings that such action is in the "best interests of the State." In Hirschberg v. Florida Power and Light Co., 137 So.2d 834 (3 D.C.A. Fla., 1962), a property owner sought to revoke a conditionally revocable license to a power company. The license permitted the power company to install two anchors on the property but required the power company to move the anchors if the anchors "interfered with future plans for the property." The District Court of Appeal held that license could not be revoked until the licensor could show to the licensee that the anchors interfered with specific plans for the property. It would be wise, therefore, for any change in the license to be based upon evidence that modification is in the best interests of the state, though the status of the license is uncertain. The second significant limitation that requires further comment is the provision in Paragraph E4 that permission to use and occupy the land as tribal land not be in conflict with the laws of the United States and the State of Florida. Of course, the first obvious meaning of this provision is that the license was not intended to sanction illegal activity or other violations of the general law. But the provision must also mean that the scope of the license must be consistent with valid acts of the Legislature subsequent to 1960 even though such legislative acts may diminish (and thereby partially revoke) the scope of the license. Statutes are presumed to be valid and enacted in the best interests of the state. Cf. ex parte Lewis,135 So. 147, 150 (Fla. 1931); State ex rel. Atlantic Coast Line R. Co. v. State Board of Equalizers, 94 So. 681 (Fla. 1922). Therefore a subsequently enacted statute inconsistent with the license to use and occupy the land as tribal land would be presumed to be a partial revocation of the license and in the best interests of the State. In addition to granting a license to use and occupy the land as tribal lands, Paragraph E4(a) and (b) provides: A year-round license privilege to Seminole Indians residing in Florida to (a) hunt and fish, (b) to take frogs for consumption as food or for sale. (Emphasis supplied.) Paragraph E4 further provides: Certain areas may be established as agricultural areas, and removed from public hunting and fishing area, as approved. Paragraph E5 provides: The right of the State Game and Fresh Water Fish Commission to establish and manage public hunting seasons in accordance with Statutes and under regulations of said Commission which does not conflict with year-round privileges allowed the Indians for hunting, fishing and taking of frogs. Regulations for public hunting in and on the committed lands shall have been approved by the Board of Commissioners of State Institutions. (Emphasis supplied.) In sum, the license purports to exempt Seminole Indians from regulations by the Game and Fresh Water Fish Commission establishing seasons, but has no effect on regulations establishing size, bag limits, species, permits, or licensing, and does not attempt to grant exclusive rights. In AGO 073-434 I had occasion to review the question of Indian hunting and fishing rights. I concluded in that opinion that with regard to state-owned lands, including wildlife management areas, except for permission to hunt and fish without a license [see s. 285.10, F.S.], nothing in Ch. 285, F.S., exempts the Seminole Indians from the regulatory control of the game commission on lands other than the reservation. I did not at that time have before me the license now in question. Insofar as hunting and fishing licenses and permits are concerned, it is clear that s. 285.10, F.S., grants to the Indians a privilege to hunt and fish on state-owned lands, including the lands committed under this license, without a license or permit (except a valid identification card issued by the Game and Fresh Water Fish Commission), until June 16, 1980. See AGO 073-434. Hunting and fishing without a permit or license on the land involved in the license is thus provided by s. 285.10, even though not mentioned in the license. The sole question raised by the license regarding hunting and fishing rights is whether a year-round hunting and fishing privilege, without regard for established seasons, could legally be granted. In 1959, s. 285.15, F.S., authorized the Trustees of the Internal Improvement Fund to grant to Seminole Indians exclusive hunting, fishing, and frogging privileges on lands under its administration and control for a term not to exceed fifteen years. Section 285.15, F.S. 1959, also allowed the trustees to exempt Indians from licensing or permit requirements. But s. 285.15 did not authorize the Trustees of the Internal Improvement Fund to exempt Indians from seasons established by the Game and Fresh Water Fish Commission and did not authorize the trustees to grant year-round privileges. The Board of Commissioners of State Institutions had no specific statutory authority to grant exemptions with regard to hunting, fishing, and frogging. I am advised, however, that the Game and Fresh Water Fish Commission since at least 1960 has taken the position that Indians may hunt and fish year-round and take frogs for commercial use on the license areas within Water Conservation Area 3A. In view of this administrative practice and the clear intention in 1960 of the Governor and Cabinet to grant these privileges to Indians, I would recommend that any change or diminution of these privileges in the license area in Water Conservation Area 3A should be accomplished only after public hearing upon adequate notice. Reading the license and s. 285.10, F.S., together, the Seminole Indians may hunt, fish, and frog on the committed state lands described in the license until June 16, 1980, without a permit or a license other than an identification card issued by the Game and Fresh Water Fish Commission. Any diminution of the privilege to hunt year-round or take frogs for commercial use should be preceded by a public hearing with adequate notice. The foregoing has been a general summary of the rights and privileges created by the license. Your second question is answered accordingly. AS TO QUESTION 3: The Everglades Recreational Planning Board was created by Ch. 73- 249, Laws of Florida (s. 372.025, F.S.). Subsection (1) of s. 372.025 declares that the legislative purpose is: "to provide for the development and management of recreational sites in the water conservation areas of the Florida Everglades. . . ." One of the primary initial duties of the board was to submit to the Game and Fresh Water Fish Commission a 1-year and a 5-year plan for "development of recreational sites in the water conservation areas of the Florida Everglades." Section 372.025(4)(c)3. The 5-year plan contains a detailed study of the recreational needs and potential of the South Florida area and sets forth a budget for capital outlay. In both 1973 and 1974, the Legislature appropriated funds to the Game and Fresh Water Fish Commission for the implementation of recreational plans in the water conservation areas. A large majority of the land area committed to use and occupancy by Seminole Indians under the license lies within Water Conservation Area 3A, which is one of the water conservation areas affected by the recreational plans of the Everglades Recreational Planning Board. In particular, the 5-year plan proposes three recreational sites along the Tamiami Trail at the southern border of the area described in the license. Miccosukee Indians presently live in this area and operate recreational concessions. The Legislature knew that Indian rights may exist in the water conservation areas and took steps to protect those rights. Section 372.025(4)(c), F.S., setting forth the duties of the Everglades Recreational Planning Board, specifically charges the board, in subparagraph 4., with including in its plans "a determination of the advisability to protect water conservation areas and Indian reservation areas from possible harmful use or development. . . ." Subsection (5) of s. 372.025, F.S., provides that "no recreational site will be developed on any Indian reservations as created by Chapter 285 without first obtaining written approval for such development from the Indians of the particular lands affected." "Indian reservations" are defined as "lands designated by Chapter 285." Section 372.025(2)(c), F.S. The lands under the license of April 5, 1960, are not "Indian reservations" under the definition and therefore are not specifically protected by the above-mentioned provisions. Impliedly, however, it can be concluded that the intent of the Legislature was to harmonize recreational plans with Indian rights, whatever rights might exist. The 5-year plan submitted to the Game and Fresh Water Fish Commission on January 1, 1974, contains numerous references to the Indians and evinces a present intent to work constructively toward recognition of Indian interests in the land. See pp. 33-41, 57, 101, 114, 115, 121, 161, 163, and 168 of the plan. In particular, on p. 114 of the 5-year plan, the action of April 5, 1960, is specifically mentioned: Seminole and Miccosukee tribes. Both the Seminole and Miccosukee Indian tribes have a keen interest in the Conservation Areas. Indeed, a portion of Conservation Area 3 has been set aside as a State Indian Reservation, and in 1960 the Florida Cabinet signed a legal instrument giving the Miccosukee Tribe certain rights in an additional 143,000 acres in Conservation Area 3. The moral and legal rights of the Indians should be respected in any recreation program and recreational use of Indian tribal lands should be subject to tribal consent. The Indians should be given a chance to reap economic benefits from those projects which are located on or near tribal lands. As noted above, a subsequently enacted statute, such as s. 372.025, F.S., inconsistent with the license of April 5, 1960, would be presumed to be a partial revocation of the license to the extent of the inconsistency. Since s. 372.025 is only a planning statute, it is not possible at this time for me to express an opinion as to whether the license of April 5, 1960, has been modified by s. 372.025. Specific conflicts must be addressed on a case-by-case basis as the circumstances become more apparent. Since it is implied that the Legislature wished to harmonize Indian interests with recreational development and s. 372.025, F.S., I would recommend that the Game and Fresh Water Fish Commission and other administrative agencies developing and implementing the recreational plans afford all interested parties, including the Seminole Tribe and the Miccosukee Tribe, an opportunity at public hearings upon due notice to make their interest known. This letter has been quite lengthy, but the factual circumstances surrounding the action of the Board of Commissioners of State Institutions on April 5, 1960, were complex and the details of the action were unclear and raised many legal issues. I felt it was necessary to treat the subject comprehensively so that we may now move forward to articulate a clear, precise, and legally effective policy in this matter for the future.